In re William A. BORDERS,
Jr., Petitioner.

No. 94–BG–991.

District of Columbia Court of Appeals.

Argued Sept. 12, 1995.
Decided Oct. 26, 1995.

John A. Shorter, for petitioner.

Wallace E. Shipp, Jr., Deputy Bar Counsel, with whom Leonard H. Becker, Bar Counsel, Washington, DC, was on the brief, for respondent.

Before STEADMAN, FARRELL and KING, Associate Judges.

Opinion for the court by Associate Judge FARRELL.

Concurring opinion by Associate Judge KING at p. 1385.

FARRELL, Associate Judge:

 Petitioner, an attorney disbarred by this court in 1983, has applied for reinstatement as a member of the Bar. D.C.Bar R. XI, § 16 (1995). To gain readmission, petitioner must establish by clear and convincing evidence

(1) That [he] has the moral qualifications, competency, and learning in law required for readmission; and

(2) That the resumption of the practice of law by [petitioner] will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest.

*Id.,* § 16(d). The Board on Professional Responsibility, agreeing with the Hearing Committee and Bar Counsel, has recommended that the petition be denied. Although "the ultimate decision on whether an attorney is reinstated is ours alone," *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985), "the Board's findings or recommendations" in this regard

"are entitled to great weight." *In re Stanton*, 532 A.2d 95, 97 (D.C.1987). We deny the petition for reinstatement.

Petitioner was disbarred by this court following an unsuccessful appeal of his 1982 federal convictions for conspiracy, obstruction of justice, and two counts of unlawful travel in interstate commerce with intent to commit bribery. Under our decisions, these crimes each involved moral turpitude. The facts of the crimes, which we do not detail here, are described in *United States v. Borders*, 693 F.2d 1318, 1319–24 (11th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983). They reveal, in sum, that petitioner took part in a conspiracy to solicit bribes from criminal defendants in exchange for lenient treatment by then United States District Judge Alcee Hastings. As the Hearing Committee stated, "That misconduct goes to the heart of the integrity of the judicial system."

■ In *In re McBride*, 602 A.2d 626 (D.C. 1992) (en banc), we departed from our previous interpretation of D.C.Code § 11–2503(a) (1995),[1] and held:

> all attorneys disbarred upon conviction of a crime involving moral turpitude shall no longer be deemed disbarred for life under D.C.Code § 11–2503(a) and . . . such attorneys, like all others who have been disbarred, shall be entitled to petition for reinstatement . . . after five years of disbarment.

*McBride*, 602 A.2d at 641. But in removing the sanction of permanent disbarment we did not mean to deprecate the severity of the crime for which an attorney has been convicted as a factor in deciding whether he should be reinstated. "[T]he nature and circumstances of the misconduct for which the attorney was disciplined," *Roundtree*, 503 A.2d at 1217, continue to weigh significantly, both because of their obvious relevance to the

attorney's "moral qualifications . . . for readmission," D.C.Bar R. XI, § 16(d)(1), and because of our duty to insure that readmission "will not be detrimental to the integrity and standing of the Bar." *Id.*, § 16(d)(2). Among the questions the court must ask, in other words, is whether "the public would regard reinstatement as an indication that the original offense was not viewed with sufficient gravity." *In re Gordon*, 385 Mass. 48, 429 N.E.2d 1150, 1155 (1982). Petitioner's efforts, proven to the satisfaction of a unanimous jury, to corrupt the administration of justice have prompted one Board member to urge us to hold "that the nature and circumstances of Petitioner's crime [alone] are so grievous and so abhorrent as permanently to preclude Petitioner from being reinstated to the practice of law in the District of Columbia" (opinion of Member McKay).

We have no occasion here to decide, and expressly leave open, the issues prompted by this suggestion, *viz.*, whether the gravity of the original crime(s) may trump every other consideration bearing on reinstatement, or whether the nature of the misconduct should weigh more heavily when the cause of disbarment is one mandated by statute (D.C.Code § 11–2503(a)) rather than a court rule. Here, it is enough for us to agree with the Board that "the gravity of the misconduct and the fact that it is so closely bound up with Petitioner's role and responsibilities as an attorney heightens the seriousness of our scrutiny of the other . . . factors" bearing on the readmission issue.

■ In *Roundtree, supra*, the court pointed to the following factors in addition to the nature and circumstances of the misconduct which are "to be considered in each reinstatement case":

> (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was im-

---

1. D.C.Code § 11–2503(a) provides:

 (a) When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice. Upon reversal of the conviction the court may

 vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment.

posed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

503 A.2d at 1217. Because no one has disputed petitioner's present competence to practice law, our focus must be on the middle three factors. Throughout the proceedings, Bar Counsel has questioned petitioner's recognition of the seriousness of his misconduct, pointing to his refusal ever to discuss the facts underlying the crimes, see discussion, *infra*, and instead his complaints about unfair treatment by the government since his arrest. Ultimately, however, the Hearing Committee "credit[ed] Petitioner's testimony that he recognizes the seriousness of his crime and genuinely is remorseful," and the Board deferred to this finding. We do likewise.

The Hearing Committee and the Board agreed that the third and fourth *Roundtree* factors counsel against petitioner's reinstatement. The two, as the Committee observed, are "intertwined in this case" and depend each for their evaluation on the record of petitioner's complete refusal to testify about the events underlying his convictions in the years since the imposition of discipline. As the Hearing Committee found, four times since his own conviction petitioner has been called to testify in proceedings against Judge Hastings. Twice he was given use immunity and ordered to testify. Both times, he refused and was jailed for contempt.

Specifically, during the fall of 1982, while petitioner's appeal of his conviction was pending in the Eleventh Circuit, he was subpoenaed to testify before the grand jury investigating criminal charges against Judge Hastings for the same alleged bribery scheme for which petitioner had been convicted. He refused to testify despite a grant of use immunity. He was adjudicated in civil contempt and confined at the Miami Correctional Facility for approximately 45 days, until the grand jury was discharged. In May, 1985, during an investigation of Judge Hastings by a committee to the Judicial Council of the United States Court of Appeals for the Eleventh Circuit, petitioner was called to testify before the investigating committee. He asserted his fifth amendment privilege and refused to testify. The committee considered a contempt proceeding, but decided not to pursue the matter.

In 1988 and 1989, impeachment proceedings took place in the United States Congress against Judge Hastings. Petitioner was called twice to testify in those proceedings. He was called before the House Subcommittee on Criminal Justice, initially responsible for determining whether to adopt articles of impeachment, and refused to testify. The Subcommittee and Committee decided not to seek immunity for petitioner, because of the likelihood that he would refuse to testify even with immunity and the delay that seeking prosecution for criminal contempt would occasion. Petitioner was then subpoenaed by the impeachment trial committee of the Senate. On June 27, 1989, he was granted use immunity, but still refused to answer questions. On August 17, 1989, he was ordered by the United States District Court for the District of Columbia to testify. When he still refused to testify, he was adjudicated in civil contempt and confined from August 25, 1989 until October 20, 1989.

At the reinstatement hearing, petitioner offered a variety of explanations for his refusal to testify in the earlier proceedings, including his philosophical objection to the impeachment proceeding, which he considered a "travesty of justice" as Judge Hastings had been acquitted of all charges by a jury. In his brief in this court, petitioner does not rely on these former explanations, conceding that they were "mistaken and ill conceived," and his failure to testify under immunity an "exercise[ of] poor judgment." Yet, even at the reinstatement hearing petitioner refused to answer questions about the underlying events, although admitting that his conduct had been "corrupt." Moreover, he offered no explanation for his involvement in the crimes, stating that "some things, I guess, are unexplainable, and this happens to be one." Describing his conduct at the time (1981) as an "aberration," he compared it to "a runaway train off the tracks. It jumped the tracks and was gone." Bar Counsel ac-

curately summarizes this and similar testimony by petitioner as asserting "that a horrible thing had happened in his life, as though he were the victim. He did not acknowledge that he was the causative actor."

The Board focused initially on petitioner's refusal to discuss the facts of his crimes at the reinstatement hearing, and disagreed with what it perceived to be Bar Counsel's position "that the price of readmission to practice of a disbarred lawyer convicted of a crime involving moral turpitude must be that petitioner's [current] willingness to testify in detail under oath about the crimes he or she has been convicted of committing." Again, we have no need to consider this issue because, as the record demonstrates, petitioner's silence extended far beyond his refusal to discuss the events in the reinstatement hearing. Referring to his refusal to cooperate throughout the proceedings against Judge Hastings, petitioner wrote in his "Statement" submitted to the Hearing Committee:

> There is a time when no justice is served by trying to bring evil on another person. The man who holds his tongue in these situations must be willing to pay the price for his silence. If he believes that his silence serves a higher good, he must be willing to pay for that higher good.

The Hearing Committee found petitioner's "commitment to silence about the events [to be] longstanding and deeply felt," but one contrary to his ethical obligations as an attorney. The Board agreed, and we do also. An attorney is obligated under former DR 1–103 and current Rule 8.3 of the Rules of Professional Conduct to report misconduct of other attorneys and judges. An attorney is required more generally "to aid the Court in carrying on and improving the administration of justice...." D.C.Bar R. I, § 2 (1995). Petitioner's refusal to answer questions when subpoenaed to testify under grants of immunity was incompatible with these obligations, and reflects unfavorably upon his rehabilitation. Although petitioner tells us he cannot undo his past refusals to testify (there is no likelihood he will again be subpoenaed to testify in relation to Judge Hastings), the Hearing Committee correctly pointed out

that, should he again face a similar decision, "there is no indication in [p]etitioner's evidence that he would follow a different course today."

Much the same question was presented in *In re Anglin*, 122 Ill.2d 531, 120 Ill.Dec. 520, 524 N.E.2d 550 (1988), which involved a lawyer convicted of possession of stolen securities after having been suspended from the bar for unrelated misconduct. While serving his sentence, he was subpoenaed before a Federal grand jury to answer questions about the identities of others involved in the plan to sell the stolen securities. He refused to answer the questions despite a grant of immunity and was held in civil contempt. When he later petitioned for reinstatement to the bar, he continued to refuse to disclose the names of those involved with him in the stolen securities transaction. Denying reinstatement, the Supreme Court of Illinois explained:

> The facts reveal that petitioner adhered to his own code of conduct in the past and that he continues to do so today.... Petitioner's continuing belief in a code of silence and nondisclosure of the misconduct of others under the circumstances described prevents us from concluding that he is clearly and convincingly rehabilitated and currently fit to practice law.
>
> Petitioner's refusal to answer questions about the involvement of other persons in his possession of the stolen securities also evidences a present and future inability to conform to the Code of Professional Responsibility. Under Disciplinary Rule 1–103 a lawyer has the duty to report the misconduct of other lawyers.... Petitioner's belief in a code of silence indicates to us that he is not at present fully rehabilitated or fit to practice law. Whether or not petitioner is ever again questioned by the proper authorities about other persons' involvement in his crime, petitioner's past and present statements cause us to believe that he would fail to report the misconduct of other attorneys if he, too, were involved in it.
>
> Because petitioner continues to express a belief in a code of personal conduct that is inconsistent with a portion of our Code

of Professional Responsibility, we are not convinced that he has been fully rehabilitated and is currently fit to practice law. *Id.* 524 N.E.2d at 554–55. We agree with this reasoning. Petitioner's election to stonewall the post-crime investigations bears not only upon the third *Roundtree* factor ("conduct since discipline was imposed, including the steps taken to remedy past wrongs"), but upon the fourth factor as well, his present character.

With respect to that factor, the Hearing Committee and the Board found still further reason for concern in petitioner's testimony at the reinstatement hearing, specifically, his inability or refusal to explain why he had become involved in the criminal conduct. Indeed, it is fair to say that this "den[ial to] the Bar" (in the Hearing Committee's language) of "the information it needs to assess Petitioner's current moral fitness" was the paramount obstacle to his reinstatement for both the Committee and the Board. The Committee found that petitioner's admittedly impressive character witnesses who knew him before his criminal acts uniformly asserted that his character was as positive and strong then as it is now. Commenting on this finding, the Board stated:

> Like the Hearing Committee, we are very concerned that Petitioner's inability to articulate the reasons for his misconduct, other than that the "period of time was like a runaway train off the tracks," gives us insufficient confidence that he can avoid such conduct in the future. The misconduct that led to his conviction extended at least over a course of weeks, and was careful, planned and deliberate. It was not an impulse. The fact that Petitioner cannot say why he did this may mean that he has not confronted his motivations from that time. As the Hearing Committee observed, it is difficult for the disciplinary system to have full assurance that the public and the judicial system will be protected from the possibility that Petitioner would be tempted to commit such an act again.

We share this concern, which in essence restates the conundrum that faced United States District Judge Gignoux at petitioner's sentencing in the criminal case:

> There is nothing which has been presented to this Court which can explain to the Court why one who has achieved what this William Borders has achieved would have jeopardized his entire life's work, his professional position, the respect of his friends and associates, by conduct such as that of which he has been found guilty by verdict of the jury in this case. The only explanation the Court has been able to derive is that there have been two William Borders—a William Borders who was known to his professional associates and friends and family and a William Borders who was revealed by the record in this case.

That conundrum persists twelve years later. Petitioner's motivation remains unexplained. As the Hearing Committee stated, "Without an understanding of how or why Petitioner engaged in conduct so out of keeping with the William Borders everyone knew and respected in 1981, it is very difficult for the Bar to have confidence that he will not do the same thing again."

We conclude that petitioner has not established by clear and convincing evidence his fitness to resume the practice of law. Accordingly, the petition for reinstatement is

*Denied.*

KING, Associate Judge, concurring:

I agree with the majority that the petition for reinstatement should be denied. I also agree that an analysis of the third and fourth *Roundtree* factors "counsel against petitioner's reinstatement." *See In re Roundtree*, 503 A.2d 1215, 1217 (D.C.1985). I write separately to echo the view expressed by one member of the Board on Professional Responsibility ("Board") who opposed reinstatement solely because of the nature of the criminal offenses committed. That member was of the view that reinstatement "would be detrimental to the integrity of the Bar, *and* detrimental to the administration of justice,

*and* subversive to the public interest."[1] I agree.

Petitioner was disbarred in 1983 on the basis of four 1982 federal convictions arising out of his role in a conspiracy to solicit a bribe from criminal defendants in exchange for lenient treatment by a United States District Court judge. Because the offenses involved moral turpitude *per se,* petitioner's disbarment, at the time it was imposed in 1983, was deemed permanent pursuant to this court's interpretation of D.C.Code § 11–2503(a) (1995),[2] in *In re Kerr,* 424 A.2d 94 (D.C.1980) (en banc). *Kerr,* however, was overruled by the en banc court in *In re McBride,* 602 A.2d 626 (D.C.1992), where we held that "all attorneys disbarred upon conviction of a crime involving moral turpitude shall no longer be deemed disbarred for life under D.C.Code § 11–2503(a) and that such attorneys, like all others who have been disbarred, shall be entitled to petition for reinstatement...." *Id.* at 641.

Thus, although petitioner's disbarment was permanent when it was imposed, the holding in *McBride* would appear to permit an attorney, who has been disbarred for committing an offense involving moral turpitude *per se,* to be eligible for reinstatement after the passage of five years. See D.C.Bar R. XI § 16(a) (1995) ("disbarred attorney not otherwise ineligible for reinstatement may not apply for reinstatement until the expiration of at least five years from the effective date of disbarment"). This reinstatement petition is the first, of what no doubt will be many, by an attorney convicted of a crime involving moral turpitude *per se* to reach the Board (and this court) since *McBride* was decided. In its report, the Board acknowledges that it is somewhat at sea concerning the standards that should be applied, observing that:

*McBride* raises extremely difficult judgments on which the Board will need guidance from the Court. To put our dilemma simply, is *McBride* a crack in a door that formerly was closed completely, a door wide open, or something in between? This case is an extremely difficult first post-*McBride* case to face the Board and the Court, because Petitioner's criminal conduct was so offensive, and his conduct since disbarment has been such a striking mix of the commendable and the unacceptable.

Report of the Board at 14–15. In my view we should respond to the Board's inquiry by holding that *McBride* opened the door only slightly, allowing for reinstatement only where the disbarring offense, as in *McBride,* sprung from conduct that was relatively minor when compared to other offenses involving moral turpitude *per se* such as those committed by petitioner.

In reaching this conclusion, I find it helpful to review the circumstances leading to McBride's disbarment as set forth in our en banc opinion:

On August 31, 1988, respondent Willard C. McBride pleaded guilty in federal court to the misdemeanor of aiding and abetting a client, Mrs. Shahid, in violating 18 U.S.C. §§ 1028(a)(4) and (b)(3) (the knowing possession of false identification document with intent to use document "to defraud the United States"). McBride, a member of the District of Columbia Bar since 1954 and a 28–year honored veteran of the Department of Justice, had retired in 1983 to become a solo practitioner. According to McBride's brief, his practice consisted of many pro bono referrals from his church, including a request that he help Mrs. Shahid and her two young children, immigrants from Pakistan, change their immi-

1. Report and Recommendation of the Board on Professional Responsibility (concurring opinion of Member McKay at 3) ("Report of the Board").

2. D.C.Code § 11–2503(a) provides:
When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend

the member of the bar from practice. Upon reversal of the conviction the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment.

gration status from visitor to resident alien. With McBride's assistance, Mrs. Shahid's petition to change her immigration status was conditionally granted. But as she made preparations to fly to Pakistan to appear personally at the United States Consulate there, she grew fearful that some snag in the process would prevent her from returning to the United States and would require her to stay in Pakistan where her physically abusive ex-husband resides. She panicked and pleaded with McBride to help her obtain an American passport to use to reenter the United States in case her new immigration status was not approved. McBride helped Mrs. Shahid provide the passport office with two identification documents that belonged to a third person. McBride accompanied her to that office and remained with her as she applied for and picked up the passport. McBride received no financial or any other benefit from his actions, all of which occurred within four days. On the other hand, he has never disputed that he knew his conduct was dishonest and designed to secure for Mrs. Shahid a passport to which she was not entitled.

*McBride*, 602 A.2d at 628 (footnotes omitted). As indicated, this recitation was derived, in large part, from McBride's own version of events as set forth in the brief filed in this court. Nonetheless, even viewed with its favorable gloss, McBride's conduct, which obviously calls for punishment and censure, is considerably less serious than this petitioner's conduct or the conduct of attorneys who have been disbarred based on convictions for such offenses as perjury or subornation of perjury, bribery of a public official, jury tampering or other like offenses involving moral turpitude *per se.* In contrast, McBride was convicted of a misdemeanor which we held could not be "deemed a conviction involving moral turpitude *per se,*" *id.* at 629.[3] Thus the permanent disbarment requirement was abolished in a case involving an offense

which, although serious, was not one that involved moral turpitude in the sense that it "incorporates a revulsion of society toward conduct deeply offending the general moral sense of right and wrong." *Id.* at 632–33.

Although I do not read *McBride* as purporting to eliminate the permanent disbarment requirement for some offenses but not others, it does not specifically preclude such a distinction. One possible bright-line identifying an offense requiring permanent disbarment, could be drawn to include only those offenses that involve moral turpitude *per se.* To me that would be consistent with the governing statute but the *McBride* court has apparently concluded otherwise.[4] *Id.* at 638–41. In any event, such a mechanistic approach has been criticized by both judges of this court and members of the Board, *id.* at 635–36, and may be no less unwieldy than the procedures applicable before *McBride* was decided.

We do not need to rely upon that line of reasoning, however, if, in applying the *Roundtree* factors, greater emphasis is placed on the nature of the offense triggering disbarment. *Roundtree* requires the weighing of five separate factors when considering reinstatement petitions: (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law. 503 A.2d at 1217. In my view, the first factor, i.e., "the nature and circumstances of the misconduct for which the attorney was disciplined," should be the overriding consideration, which in some cases, even where a petitioner has satisfied the other four factors, would require denial of the reinstatement petition.

---

**3.** The underlying conduct could, of course, involve moral turpitude depending upon the circumstances. To that end, the *McBride* court remanded the case to the Board to conduct a full hearing on whether McBride's conduct involved moral turpitude. *Id.* at 635.

**4.** Because *McBride* was argued before I joined the court, I did not participate in the decision even though the opinion was issued after my arrival on the court.

By emphasizing the "nature and circumstances of the misconduct" we would give real meaning to the governing rule which provides that to gain reinstatement an attorney must show, by clear and convincing evidence, that

> the resumption of the practice of law by the attorney will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest.

D.C.Bar R. XI § 16(d)(2). In imposing this burden on a disbarred attorney seeking reinstatement, we are acknowledging that in some cases the criminal conduct is so offensive, so contrary to the norms of society, and so destructive of the system of justice, that a conviction should result in disbarment, if not for life, then for such a significant period of time that there is no danger that reinstatement would result in diminished respect for members of the bars, the legal profession, and the system of justice by the public at large. Without doubt, this is such a case.

In support of that conclusion, I think it important to emphasize that this petitioner was convicted for his role as a middle-man, between two defendants (the "Romanos") in a criminal case and the federal judge who presided over their trial, in a scheme to obtain benefits for the Romanos from the trial judge in return for money. The Romanos had been convicted of twenty-one counts of racketeering and related charges. After the trial, the judge ordered the forfeiture of $1.2 million worth of their racketeering-related property pursuant to 18 U.S.C.A. § 1963(a). The evidence at petitioner's trial revealed that petitioner told an informant, who was thought to have ties to the Romanos, that the trial judge was willing to set aside some or all of the forfeiture and to provide other consideration in the form of some unspecified reduction in sentences. The price was to be $150,000 and $25,000 was paid to petitioner as a down-payment with the remainder payable after the forfeiture was set aside. The judge then issued an order setting aside the forfeiture in part, returning some $845,000 to the Romanos. Petitioner was arrested three days later when he attempted to collect the remaining

$125,000 of the bribe. See *United States v. Borders*, 693 F.2d 1318, 1319–23 (11th Cir. 1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983).

The Board and the majority would reject petitioner's reinstatement petition based upon his subsequent conduct and its assessment of his present character. I would deny reinstatement solely on the basis of the offenses of conviction, because any attorney who has been found, beyond a reasonable doubt, to have engaged in the conduct set forth above, should not be reinstated because reinstatement would be "detrimental to the integrity and standing of the Bar," detrimental "to the administration of justice," and "subversive to the public interest."