### In re Kevin M. SABO, Petitioner.

### A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 435676).

### No. 11–BG–421.

District of Columbia Court of Appeals.

Argued May 16, 2012.

Decided Aug. 16, 2012.

Kevin M. Sabo, Burke, VA, pro se.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Wallace E. Shipp, Bar Counsel, and Elizabeth A. Herman, Deputy Bar Counsel, were on the report for Bar Counsel.

Before OBERLY and BECKWITH, Associate Judges, and STEADMAN, Senior Judge.

OBERLY, Associate Judge:

Petitioner Kevin Sabo, an attorney disbarred by this court on consent in 2003 following his felony conviction of attempted malicious wounding, seeks reinstatement as a member of the Bar of the District of Columbia. Upon receiving Bar Counsel's report not contesting Mr. Sabo's

petition for reinstatement, we referred this matter to the Board on Professional Responsibility (the "Board") for its recommendation, which in turn referred the matter to a Hearing Committee for fact-finding. Following an evidentiary hearing and briefing, the Hearing Committee recommended reinstatement, a position Bar Counsel did not oppose. The Board disagreed and opposed Mr. Sabo's reinstatement. We agree with Bar Counsel and the Hearing Committee that Mr. Sabo has demonstrated his fitness to resume the practice of law. Accordingly, we grant his petition for reinstatement.

## I. Facts and Procedural History

In 2000, a Virginia jury convicted Mr. Sabo of attempted malicious wounding, a felony, in violation of Va.Code §§ 18.2–26 and 18.2–51 (1994). The conviction was upheld by a divided panel of the Court of Appeals of Virginia. *Sabo v. Commonwealth*, 38 Va.App. 63, 561 S.E.2d 761 (2002). Mr. Sabo served twelve months in prison and paid a fine of $1,628. Mr. Sabo conceded that the crime of which he was convicted involved an act of moral turpitude and, in 2003, consented to disbarment. *In re Sabo*, 828 A.2d 168 (D.C.2003) (per curiam).

The jury heard evidence that Mr. Sabo cut the brake lines of a vehicle owned by his former girlfriend, Heather Nicole Lawrence, days after she ended their relationship. When Ms. Lawrence next drove her vehicle, she lost control and hit a fence, a low brick wall, and a tree. No one sustained injury. From trial through this reinstatement proceeding, Mr. Sabo has maintained his innocence.[1]

Yet Mr. Sabo freely acknowledges that his relationship with Ms. Lawrence, which spanned the period when he was separated from his first wife, was "destructive," "stormy," and "mutually abusive." He contends that his struggle with depression and other mental health challenges took him "down a path, down a spiraling tube" that brought about the events that led to his conviction and that it took him years of therapy to "understand truly how bad off [he] was at the time."[2] Following his release from prison in 2003 until the present time, Mr. Sabo has been receiving mental health treatment, including psychotherapy and medication management.

Since his release, Mr. Sabo has built a small but well-regarded home renovation business and has become very active in his church. However, his positive conduct is tempered by a regrettable incident at a Home Depot store in Fairfax, Virginia. On April 19, 2009, Mr. Sabo attempted to return a special-order item that arrived damaged. Upon being accused of damaging the item after receiving it, Mr. Sabo engaged in an argument with the store clerk. The altercation led to Mr. Sabo's receiving a refund for the item as well as for other items he had not yet purchased.

---

1. At his criminal trial, Mr. Sabo was precluded from introducing testimony from his psychiatrist in an attempt to establish that certain incriminating admissions introduced against him were a response to Ms. Lawrence's threats of blackmail, to which Mr. Sabo was particularly susceptible because of various mental health issues from which he suffered. *See Sabo*, 561 S.E.2d at 773 (Branton, J., dissenting) ("I would hold that … Sabo's admissions were obtained by duress, threats, and sympathy falsely aroused.").

2. Dr. Neil Blumberg, the psychiatrist hired by Bar Counsel to evaluate Mr. Sabo, described the relationship as "very unstable" and Ms. Lawrence as "fairly unstable and manipulative," characteristics which "drove [Mr. Sabo] crazy in technical terms." He explained, "one minute they're in love. The next minute she's rejecting him. She's manipulating him for money and he, with the dependent features of his personality was very much sucked into this, was in love with her, was kind of infatuated, and became emotionally dependent on her."

He was later arrested on a charge of larceny by false pretense but ultimately placed on probation in a program geared toward first-time offenders. Upon satisfaction of the terms of his probation, including 75 hours of community service, the charge was dismissed.

Mr. Sabo filed a petition for reinstatement on January 4, 2011. Amendments to the District of Columbia Bar Rules governing the disbarment and reinstatement of member attorneys became effective on August 1, 2008. Because this is the first uncontested petition for reinstatement under the amended rules in which this court has requested the recommendation of the Board, we outline the recent modifications to the petition process.

The amended rules provide a dual-track process for petitions for reinstatement: the contested and uncontested processes. Whether a petition is contested or uncontested is a decision made by Bar Counsel after the performance of a "suitable investigation." D.C. Bar R. XI, § 16(e). When Bar Counsel contests a petition, the procedure under the amended rules remains materially the same as before: a hearing is convened after which the Hearing Committee submits a report of its findings and recommendations to this court for a final disposition. *Id.* at § 16(d).[3]

In contrast, uncontested petitions bypass the Hearing Committee. Bar Counsel must file a report with this court "stating why Bar Counsel is satisfied that the attorney meets the criteria for reinstatement." D.C. Bar R. XI, § 16(e). Thereafter, this court may grant the petition, deny it, or request a recommendation from the Board before deciding whether to grant or deny the petition. *Id.*

Mr. Sabo's petition came to this court uncontested by Bar Counsel and it remains so, although Bar Counsel did recommend that petitioner be required to continue mental health treatment "at a frequency and manner consistent with the mental health professional's recommendations, for five years after his reinstatement." Confronting lingering questions regarding petitioner's fitness for reinstatement arising out of the 2009 Home Depot incident, a motions panel of this court held Mr. Sabo's petition in abeyance and referred the matter to the Board for its recommendation. The motions panel focused the Board's review on three questions: (1) whether, in light of Mr. Sabo's re-arrest, he had sufficiently addressed the mental health issues that led to the circumstances that resulted in disbarment; (2) to what extent the five-year monitoring condition of reinstatement suggested by Bar Counsel would sufficiently protect the public, and the rationale for a five-year period; and (3) whether Mr. Sabo had sufficiently met his burden to prove fitness for reinstatement through satisfaction of the factors set out in *In re Roundtree*, 503 A.2d 1215, 1217 (D.C.1985). Mr. Sabo requested an evidentiary hearing to present character and mental health testimony, as well as testimony going to the *Roundtree* factors generally, to assist the Board in responding to the court's questions. Bar Counsel consented to petitioner's request, and the Board accordingly referred the matter to a Hearing Committee for a fact-finding hearing and to make a recommendation on reinstatement.

The Hearing Committee held an evidentiary hearing on July 21, 2011, at which it heard live testimony and arguments, followed by written submissions from peti-

---

3. "In its discretion, the court may request the Board's recommendation on the petition for reinstatement." D.C. Bar R. XI, § 16(d)(2).

tioner and Bar Counsel. Mr. Sabo's witnesses provided character evidence on his behalf, as well as evidence of his mental health treatment. Bar Counsel called a psychiatrist it had hired to evaluate Mr. Sabo's fitness to resume the practice of law. All witnesses, including the psychiatrist called by Bar Counsel, discussed the extent to which Mr. Sabo had worked to overcome his past difficulties and turn his life around. On September 20, 2011, the Hearing Committee issued a lengthy report in which it made extensive findings of fact and recommended Mr. Sabo's reinstatement, adopting the condition proposed by Bar Counsel that Mr. Sabo continue his mental health treatment for five years after his reinstatement. The Board, however, issued a report on November 9, 2011, recommending that the petition be denied. Although the Board "reviewed and adopt[ed] the Findings of Fact made by the Committee as supported by substantial evidence in the record," it took issue with Mr. Sabo's refusal to admit culpability for the attempted malicious wounding, and it was bothered by the absence of testimony regarding his claim of innocence. The Board also was concerned about the Home Depot incident, which it viewed as an indicator of Mr. Sabo's difficulties in dealing with stress, and concluded that his history of psychotherapy was "too intermittent and short-lived" to support reinstatement. One Board member issued a concurring opinion, agreeing with the majority that Mr. Sabo's petition should be denied but expressing the view that the Board had made too much both of Mr. Sabo's mental illness and the Home Depot incident.

Nevertheless, he agreed with the denial of the petition on the grounds that Mr. Sabo had failed to demonstrate a reasonable basis for maintaining his claim of innocence of the attempted malicious wounding charge.

Mr. Sabo filed exceptions to the Board's report; Bar Counsel filed a statement with this court stating that it "did not oppose Petitioner's reinstatement" and that it "support[ed] the Hearing Committee's Report and Recommendation also recommending reinstatement." We are now called upon to determine whether Mr. Sabo is fit for readmission to the Bar. We hold that he is and grant his reinstatement petition.

## II. Analysis

■ In reinstatement cases the burden of proof is on the petitioner to "demonstrate by clear and convincing evidence that he or she is fit to resume the practice of law." *In re Robinson,* 705 A.2d 687, 689 (D.C.1998) (*Robinson I*) (internal quotation marks omitted); D.C. Bar R. XI, § 16(d)(1).[4] To do so, the petitioner must establish that he or she has the "moral qualifications, competency, and learning in law required for readmission" and that his or her reinstatement would "not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." D.C. Bar R. XI, § 16(d)(1)(a)-(b). In interpreting these criteria, we apply the five factors articulated in *Roundtree,* 503 A.2d at 1217: "(1) the nature and circumstances of the misconduct for which the attorney was dis-

---

4. We cite to the section of the 2008 amended rules dealing with contested petitions for reinstatement even though Bar Counsel does not now, and never has, contested Mr. Sabo's reinstatement. In light of the court's referral of Mr. Sabo's petition to the Board for a recommendation, and the Board's recommendation against reinstatement, we believe it

appropriate to consider this matter under the factors applicable to contested cases, notwithstanding the fact that the rules are drafted in such a way as to draw a distinction between contested and uncontested matters only on the basis of the position taken by Bar Counsel. *See* D.C. Bar R. XI, §§ 16(d) and (e).

ciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law."

■ Although we place "great weight" on the recommendations of the Board and Hearing Committee, *In re Bettis,* 644 A.2d 1023, 1027 (D.C.1994), this court has the ultimate authority to decide whether to grant a petition for reinstatement. *Id.* (citing *In re Harrison,* 511 A.2d 16 (D.C.1986), and *Roundtree* ). Indeed, the "recommendation of the BPR is only a recommendation, and ... the determination of fitness to resume the practice of law rests entirely with this court." *Roundtree,* 503 A.2d at 1217. By contrast, the Board is obliged to accept the findings of fact made by the Hearing Committee, which include credibility determinations, if they are "supported by substantial evidence in the record, viewed as a whole." *In re Micheel,* 610 A.2d 231, 234 (D.C. 1992). Such deference is appropriate because the Hearing Committee is "the only decision-maker which had the opportunity to observe the witnesses and assess their demeanor." *In re Ray,* 675 A.2d 1381, 1387 (D.C.1996).

### A. The Nature and Circumstances of the Misconduct for Which the Petitioner Was Disciplined

■ The seriousness of the attempted malicious wounding conviction underlying Mr. Sabo's disbarment, which we described at the outset, cannot be overstated. Mr. Sabo consented to disbarment *nunc pro tunc* and conceded that his conviction involved an act of moral turpitude. Still, his conviction is not necessarily a permanent bar to reinstatement. *See In re McBride,* 602 A.2d 626, 641 (D.C.1992) (en

banc) (concluding that attorneys "disbarred upon conviction of a crime involving moral turpitude shall no longer be deemed disbarred for life ... and that such attorneys, like all others who have been disbarred, shall be entitled to petition for reinstatement ... after five years of disbarment"). As the Hearing Committee noted, quoting *In re Borders,* 665 A.2d 1381, 1382 (D.C.1995), Mr. Sabo's conviction "did not involve or pertain to the practice of law nor go 'to the heart of the integrity of the judicial system.' " In *Borders,* petitioner's underlying convictions, arising out of solicitation of bribes from criminal defendants in exchange for lenient treatment from a federal judge, caused us to give heightened scrutiny to the other *Roundtree* factors. *Borders,* 665 A.2d at 1382. The conviction underlying Mr. Sabo's disbarment, although undeniably disturbing, is quite different.

Whether certain acts of misconduct might be so heinous as to warrant an automatic, or *per se,* rule of disbarment without possibility of reinstatement is a question we have been urged to address in the past but we have declined to do so. *See, e.g., Borders,* 665 A.2d at 1382 (declining to decide "whether the gravity of the original crime(s) may trump every other consideration bearing on reinstatement" and constitute a permanent bar to reinstatement, but denying petition for reinstatement for failure to satisfy the *Roundtree* factors). Here, too, we are not prepared to rule that the misconduct underlying petitioner's conviction for attempted malicious wounding is a permanent bar to his reinstatement. The Board does not argue for such a result in this case; rather, it contends only that petitioner must admit culpability or explain his grounds for maintaining his innocence. We leave for another day whether such a

rule might ever be appropriate but, in light of petitioner's extensive explanation of the circumstances that led to the criminal charge against him,[5] we conclude that the "nature and *circumstances* of the misconduct" for which petitioner was disciplined have been adequately explained and do not defeat his petition for reinstatement. *Roundtree*, 503 A.2d at 1217 (emphasis added). We also find it significant that "both the prosecuting attorney[s] in [Mr. Sabo's] trial and his appeal in Virginia" do "not oppose [Mr. Sabo's] reinstatement,"[6] and that, when there were mitigating circumstances, other courts have suspended rather than disbarred attorneys convicted of crimes of a similar character.[7]

Accordingly, we turn to an analysis of the other *Roundtree* factors in our assessment of petitioner's fitness to resume the practice of law.

## B. Recognition of the Seriousness of Misconduct When Petitioner Maintains His Innocence

The Hearing Committee found that Mr. Sabo recognized the seriousness of his misconduct. We agree. We assess a petitioner's recognition of the seriousness of misconduct as a "predictor of future conduct." *In re Reynolds*, 867 A.2d 977, 984 (D.C.2005) (per curiam). "If a petitioner does not acknowledge the seriousness of his or her misconduct, it is difficult to be confident that similar misconduct will not occur in the future." *Id.*

### 1. Assertion of Innocence

Determining if and how a petitioner may recognize the seriousness of misconduct while steadfastly maintaining his or her innocence is a matter of first impression for this court. It is a rare occurrence where an attorney is convicted of a felony involving a crime of moral turpitude but denies culpability throughout the criminal proceedings,[8] and later petitions for reinstatement to the bar.

---

5. See pages 19–20, *infra.*

6. This information was provided by Deputy Bar Counsel, who advised the Hearing Committee that both attorneys talked to her on the condition that their remarks had to be off the record because they were not authorized to speak for their respective offices.

7. *In re Seshul*, 289 Ga. 910, 717 S.E.2d 262, 263 (2011) (suspending rather than disbarring attorney convicted of felony aggravated assault and sentenced to five years, which was commuted to time served and probation, due to mitigating circumstances including that the attorney had "no prior discipline; he experienced personal and emotional problems during the relevant time period; he has taken rehabilitative steps ...; he has good character and a good reputation; he has displayed a cooperative attitude towards these proceedings; and no harm was caused to or directed at any of Seshul's clients"); *In re Curran*, 115 Wash.2d 747, 801 P.2d 962, 963–64, 973–74 (1990) (en banc) (suspending rather than disbarring attorney convicted of two counts of vehicular homicide and sentenced to 26 months in prison, noting that maintenance of public confidence in the bar by disciplining attorneys whose conduct reflects a disregard

for the rule of law is "not nearly as important as protecting the public from unworthy practitioners [and] vigilant protection of the public from the dishonest and the incompetent will do more to enhance public confidence in the bar than enforcement of our rules having a more tangential relationship to practice"); *In re Mostman*, 47 Cal.3d 725, 254 Cal.Rptr. 286, 765 P.2d 448, 449, 458–59 (1989) (en banc) (suspending for five years rather than disbarring attorney convicted of "solicitation to commit assault by means of force likely to produce great bodily injury" and sentenced to two years in prison where there were mitigating factors, including "great emotional distress in his personal life," his credible display of "remorse," acceptance of responsibility for his actions, receiving "psychiatric treatment," and his "good reputation among his clients and with members of the community, even among those persons apprised of the extent of his wrongs").

8. Mr. Sabo also maintained his innocence in a civil proceeding for $3.5 million in damages brought against him by his former girlfriend after the close of the criminal proceedings. The case was dismissed on Mr. Sabo's motion. We place little or no weight on this

The Board asserts that Mr. Sabo cannot establish that he "recognizes the seriousness of his misconduct" and "at the same time, deny his culpability." We disagree. Neither our legal standard for reinstatement to the Bar, as set forth in the *Roundtree* factors, nor case law from other jurisdictions requires that one who petitions for reinstatement must affirm culpability for his adjudicated guilt, and we decline to adopt such a rule. "Simple fairness and fundamental justice demand that the person who believes he is innocent though convicted should not be required to confess guilt to a criminal act he honestly believes he did not commit." *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429, 437 (1975), *disavowed on other grounds by Aetna Cas. & Sur. Co. v. Niziolek*, 395 Mass. 737, 481 N.E.2d 1356 (1985).

Of the courts that have addressed this situation, none requires a confession of guilt as a requirement for reinstatement or holds that an assertion of innocence is a bar to reinstatement. *See, e.g., In re Page*, 94 P.3d 80, 83 (Okla.2004) ("[A]n applicant's assertion of innocence, standing alone, is not a bar to reinstatement."); *In re Walgren*, 104 Wash.2d 557, 708 P.2d 380, 384 (1985) (en banc) (stating that petitioner's "continued assertion . . . of his innocence does not reflect negatively on our assessment of his rehabilitation"); *In re Mitchell*, 249 Ga. 280, 290 S.E.2d 426, 427 (1982) (per curiam) (holding that "continued assertion of innocence following conviction is not conclusive proof of lack of rehabilitation" and ordering that petitioner be reinstated to the bar); *In re Wigoda*, 77 Ill.2d 154, 32 Ill.Dec. 341, 395 N.E.2d 571, 573–74 (1979) (holding that a continuing belief in one's innocence is not sufficient to bar reinstatement and noting the distinction between repentance and reha-

bilitation); *Hiss*, 333 N.E.2d at 437 ("[W]e refuse to disqualify a petitioner for reinstatement solely because he continues to protest his innocence of the crime of which he was convicted"); *In re Braverman*, 271 Md. 196, 316 A.2d 246, 248–49 (1974) (ordering petitioner to be reinstated despite his claim of innocence as he made a "complete turnabout" from the conduct which resulted in his conviction, thus demonstrating his reformation).

To hold otherwise and enact "a rule requiring admission of guilt and repentance" would "create[ ] a cruel quandary: [petitioner] may stand mute and lose his opportunity; or he may cast aside his hard[-]retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness to practice law." *Hiss*, 333 N.E.2d at 437. Mr. Sabo himself recognized this quandary in his testimony before the Hearing Committee:

> I will continue to claim my innocence of the underlying charge. And if making that claim would prevent me from being an attorney, then that's the price I would have to pay because I, long ago, as soon as the accusations and arrest was made, rejected opportunities to either avoid jail or to lessen the penalties if I made some admission. I cannot do so 10 years later and will pay whatever price I have to for that.

Nevertheless, a claim of innocence will not relieve the petitioner of his or her burden to demonstrate recognition of the seriousness of the misconduct that led to disbarment. In this unusual situation, we look to the purpose of the second *Roundtree* factor, which is to predict the likelihood that misconduct will not reoccur in the future. *Reynolds*, 867 A.2d at 984; *see also Hiss*, 333 N.E.2d at 436 (finding that it is "sufficient that the petitioner adduce

proceeding except to note that Mr. Sabo's defense of that claim comported with his de-

nial of criminal wrongdoing. See note 1, *supra*.

substantial proof that he has such an appreciation of the distinctions between right and wrong in the conduct of men toward each other as will make him a fit and safe person to engage in the practice of law") (internal quotation marks omitted). We decline the opportunity to set parameters encompassing all future reinstatement cases in which a petitioner asserts his or her innocence. These cases are necessarily decided on an individual basis. However, based on the totality of the circumstances in this case, we conclude, in light of the facts found by the Hearing Committee and set forth below, that Mr. Sabo proved by clear and convincing evidence that he has accepted responsibility for the conduct that led to his conviction and that he will not engage in similar conduct in the future.

*First,* Mr. Sabo accepted responsibility for his "obsessive behavior" and participation in a "mutually abusive relationship," which together set off a chain of events leading to his conviction. *Second,* Mr. Sabo acknowledged the seriousness of his mental illness and was forthcoming about its effect on his decision-making capabilities and actions. See *infra* pp. 19–20. Further, Mr. Sabo provided detailed information on his history of mental health treatment and his commitment to remaining in treatment indefinitely. See *infra* Part C.1. *Third,* Mr. Sabo recognized "the seriousness of [his] criminal conviction on the reputation of the legal community in the District of Columbia." *Fourth,* the Hearing Committee found Mr. Sabo's testimony "highly credible," and noted that he was forthcoming in proffering information and answering questions.

The facts noted above present important similarities to the petition for reinstatement considered in *In re Spilman,* 104 P.3d 576 (Okla.2004). In *Spilman,* the attorney, over a plea of innocence, had been convicted of bribing a witness and

was sentenced to one year in prison and fined $1,000. *Id.* at 577. To be considered for reinstatement to the Oklahoma Bar, applicants must demonstrate by clear and convincing evidence "consciousness of wrongful conduct." *Id.* at 577–78. Yet, professing one's innocence is "not a bar to granting reinstatement." *Id.* at 580. Ms. Spilman satisfied the court that she was "conscious of [her] wrongful conduct" by acknowledging that she did not conduct herself in a professional manner, her actions gave the appearance of "serious impropriety," and she brought "disrepute and embarrassment ... upon the profession." *Id.* at 579. Further, through counseling, Ms. Spilman sought to understand why she had put herself in a position and engaged in conduct that led to a felony conviction and to ensure she would not do so again. *Id.* She also proffered numerous character witnesses who attested to her good character and moral fitness. *Id.* We find *Spilman* persuasive in our evaluation of Mr. Sabo's petition.

Finally, we reject as inapt the Board's citation of cases in which this court denied reinstatement because the petitioners minimized their misconduct or failed to articulate the reasons for it. For example, in *Reynolds,* this court concluded that the petitioner lacked recognition of the seriousness of his actions because he referred to two DWI convictions, one hit-and-run conviction, and one conviction for eluding a police officer as mere "traffic violations" and only acknowledged the seriousness of his offenses "in the eyes of the law." 867 A.2d at 985. Further, the court was troubled by petitioner's failure to recognize the import of his long-term alcohol abuse. *Id.* In contrast, while Mr. Sabo denies that he tampered with Ms. Lawrence's vehicle, he recognizes the seriousness not only of the charge, but also of his behavior that led a jury to conclude that he was guilty. He

also recognizes, and has obtained treatment for, his mental illness.

Equally inapt is *Borders,* 665 A.2d at 1385. In *Borders,* the "paramount obstacle to [petitioner's] reinstatement" was his "inability or refusal to explain why he had become involved in the criminal conduct"; he stated only that the "period of time was like a runaway train off the tracks." *Id.* This rather thin attempt at an explanation gave the court "insufficient confidence that [petitioner] can avoid such conduct in the future." *Id.* Quite the opposite is true here. Mr. Sabo provided Bar Counsel and the Hearing Committee with a detailed explanation of how and why his conduct led to his conviction, which gives us confidence that he will avoid such conduct in the future.

## 2. Basis for Mr. Sabo's Claim of Innocence

 In light of what we have just held—that a confession of guilt is not required for a petitioner seeking reinstatement to show that he "recognizes the seriousness of [his] misconduct," *Roundtree,* 503 A.2d at 1217—we likewise hold that one seeking reinstatement is not required to explain the grounds upon which he maintains his claim of innocence. Such a requirement presents an insurmountable obstacle to reinstatement, and one we decline to impose. Neither the Board, acting upon the facts found by the Hearing Committee, nor this court is equipped to retry petitioner's underlying criminal case. Stated differently, neither the Board nor we are positioned to reach credibility determinations on petitioner's claim of innocence, nor is it our province to reweigh the legal objections to petitioner's conviction raised on appeal. The judgment of the Virginia courts is final and we accept it as such. For that reason, it is not clear to us why the Board was of the view that, absent an explanation for his claim of innocence, petitioner could not continue to

deny culpability. Even if petitioner offered such an explanation, neither the Board nor this court would be equipped to accept it over the final judgment of the Virginia courts.

Our inability to retry the Virginia case does not mean that petitioner cannot satisfy the second *Roundtree* factor. The purpose of that factor is to persuade us that a disbarred lawyer sufficiently understands the gravity of the misconduct that led to his disbarment, such that we are confident that the situation will not reoccur. Petitioner has done that here. He gave extensive testimony before the Hearing Committee explaining his mental illness and its effect on his decision-making that led to his being charged with attempted malicious wounding. We quote petitioner's testimony because it is difficult to imagine more forthright and moving words than petitioner's own to demonstrate that he fully understands the severity of the misconduct that led to his disbarment:

> I have never claimed to be some sort of innocent party walking down the street and got picked up by the police simply because I met the description of the individual. I was deeply involved in a horrible mutually emotionally abusive relationship, that I frankly did not know how to extricate myself from.
>
> In retrospect ... I can understand the dependency problem that kept m[e] in a relationship that anybody who was healthier and stronger would have gotten themselves out of.
>
> \* \* \* \* \* \*
>
> I did not recognize how emotionally distraught I was at the time. That's only something that's come with years and years of work, reflection and therapy.
>
> \* \* \* \* \* \*
>
> Who I am now is not who I was in 1999 and '98. I'm humble. I recognize

that I don't make sound decisions if I don't think them through well enough, that everything requires a deeper breath and a little bit of a pause and continued medication frankly.

I used to be anti-pill.... That's been the hard—the thought that I would be on medication for the rest of my life, once I've accepted that, it's so much easier to make these other decisions.

\* \* \* \* \* \*

I sit alone and reflect a lot more than I used to. In some forums, you could call that prayer. In other forums, it's sort of looking. It's the deep breath of trying to look inward. This is certainly true with the most important issues, the more important decisions....

In reaching our determination, we place "great weight" on the findings of the Hearing Committee, *Bettis*, 644 A.2d at 1027, as "the only decision-maker which had the opportunity to observe [Mr. Sabo] and assess [his] demeanor." *Ray*, 675 A.2d at 1387. The Committee found Mr. Sabo's testimony regarding his recognition of the seriousness of his misconduct "credible." We have no difficulty in accepting that assessment, and we hold that Mr. Sabo satisfied his burden of establishing that he will not again engage in misconduct similar to that which led to the charges against him or of which he was convicted.

### C. Petitioner's Post–Discipline Conduct

Under the third *Roundtree* factor, we consider a petitioner's "conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones." *Roundtree*, 503 A.2d at 1217. Since being convicted more than 12 years ago, Mr. Sabo has made significant positive changes, creating a convincing case of rehabilitation.

In contrast to his "stormy and mutually abusive relationship" with Ms. Lawrence,

Mr. Sabo now is in a stable marriage and has established a better relationship with his former wife. A man of faith, Mr. Sabo is "very active" in his church and has taken on "increasingly responsible positions," including chairing the worship committee, teaching Sunday School, participating in mission trips, representing the church at the annual Virginia Methodist conference, and being elected by the congregation to represent Virginia Methodist churches at the Methodist quadrennial governing conference of the Southern Region. Reverend Clarence R. Brown, Jr., the senior pastor at the church Mr. Sabo attends, testified to Mr. Sabo's involvement and believes it has "transformed his life for the better." The Hearing Committee was "particularly impressed" with Reverend Brown's testimony and placed "great weight" on it.

Notwithstanding these positive changes in Mr. Sabo's life, of concern to the Board was the consistency and duration of Mr. Sabo's mental health treatment as well as the incident at Home Depot during which Mr. Sabo lost his temper and was arrested. We conclude that Mr. Sabo's mental health treatment has been sufficiently consistent and of an adequate duration to satisfy this factor. And while the Home Depot incident shows an error in judgment, we do not think it warrants a denial of reinstatement.

### 1. Mental Health Treatment

Mr. Sabo's struggle with mental health illness, including chronic depression and a mild personality disorder with "dependent features," is linked to the conduct surrounding his conviction and is of particular concern to this court in evaluating his petition for reinstatement. According to Dr. Julian Brantley, who treated Mr. Sabo intermittently from 1995 to 2000, at the time Mr. Sabo was charged and convicted of attempted malicious wounding, he "experi-

enced an exacerbation of his depression ... as well as severe anxiety symptoms," which caused "impairments in his executive—what we call ego functioning. And poor judgment." Dr. Brantley "definitely state[d]," however, that Mr. Sabo does not have a "violent personality" and also stated that he is "highly unlikely to commit acts of violence or crimes against society." Dr. Brantley added that "the crime for which he was committed is not in keeping with his basic character structure."

Since his release from prison, Mr. Sabo voluntarily has participated in mental health treatment. Unable to afford private therapy upon his release, Mr. Sabo attended support groups. Mr. Sabo's commitment to receiving mental health treatment indefinitely manifested in 2004 or 2005 after he experienced a "depressive episode" that "wasn't necessarily triggered by anything." Following that episode, in March 2005, Mr. Sabo sought individual treatment at a county facility offering discounted services where he received medication management and psychotherapy. According to Mr. Briggs, the outpatient therapist for the Alexandria Community Services Board, Mr. Sabo's goal in therapy was to "get [his] honor back" and he was cooperative and forthright during their sessions. Based on the recommendation of Mr. Briggs, Mr. Sabo's psychotherapy treatment concluded in July 2006, although he received medication treatment for several months thereafter. The Hearing Committee found Mr. Briggs to be a "very credible witness." In 2008, Mr. Sabo began medication treatment with Dr. Blanks at George Washington University, and later, upon Dr. Blanks' recommendation, began psychotherapy with Dr. Dangremond. At the time of the hearing, Mr. Sabo was still under the care of Dr. Dangremond who, in a letter to Bar Counsel, described Mr. Sabo as "engaged in therapy" and stated that he has "demonstrated a willingness to change." Further, she assessed

Mr. Sabo as a "low risk for relapse into the destructive patterns of behavior he exhibited in the past" and did not believe that discontinuing therapy would increase the "risk of relapse." Nevertheless, Mr. Sabo has expressed a commitment to continued mental health treatment. He testified:

[I]f you have[ ] experienced depression, crying uncontrollably, hiding under a blanket and not wanting to get out, you would agree that you never want to be in that position again: I recognize that this is a lifelong battle and that therapy ... whatever is recommended by the doctor, is something that I am going to face throughout my life.... I'm prepared to do that and would have no problems with whatever restrictions were recommended or imposed by the Court.

Bar Counsel's forensic psychiatrist, Dr. Neil Blumberg, and the Hearing Committee, respectively, found Mr. Sabo's commitment to treatment "sincere" and "highly credible." In fact, Dr. Blumberg concluded that Mr. Sabo's depression is "well controlled" and he does "not anticipate [that] with treatment ... [Mr. Sabo] would have a major worsening of the depressive illness." Although Mr. Sabo's mental health issues affected his personal life, Dr. Blumberg found no evidence that these issues created problems in the work environment.

We take note of the Board's concern that Mr. Sabo has been in "psychotherapy" only intermittently and that he was not in psychotherapy at the time of the incident at the Home Depot. We are not troubled by these facts. As set out above, Mr. Sabo received treatment based on the recommendations of his mental health professionals. More importantly, Mr. Sabo has expressed a sincere commitment to continuing mental health treatment for the rest of his life. We accord these findings

of the Hearing Committee the "great weight" to which they are entitled, and they strongly influence our decision to grant Mr. Sabo's petition for reinstatement.

### 2. Incident at Home Depot

In connection with his home renovation business, Mr. Sabo frequently patronized home improvement stores. On April 19, 2009, he attempted to return a special-order kitchen cabinet that arrived damaged and, having received damaged goods from Home Depot twice before, was annoyed. Being met with reluctance from the cashier to accept the return and under pressure from a client upset by the delay in completing her kitchen renovation, Mr. Sabo argued with the cashier. Frustrated, Mr. Sabo asked the cashier to refund the items in his cart, which included both the damaged cabinet and items he had not yet purchased. The clerk gave the requested refund, including $52 for the items Mr. Sabo had not purchased. Attempting to exit the store, Mr. Sabo was stopped by an employee who realized Mr. Sabo had received an improper credit. Mr. Sabo was adamant that he probably would have realized his "mistake" the "moment [he] began putting [those] items back into [his] car." But, after learning of Mr. Sabo's prior felony conviction, Home Depot pressed charges.

Although Mr. Sabo proffered a plea of guilty to the charge of larceny by false pretense, no judgment was entered. Instead, the court placed Mr. Sabo on probation in a program normally reserved for first-time offenders and dismissed the charges upon his successful completion of the program. Mr. Sabo described his actions as a "careless mistake driven by a dispute [he] was having," testified that he cooperated with the Home Depot staff "from the moment [he] recognized the mistake," and "at no time did he enter the Home Depot with the intent of committing fraud." The Hearing Committee deemed his testimony "credible."

We agree with Board member Theodore Frank's concurrence in his conclusion that the "majority has made more of [the Home Depot incident] than the facts warrant" and that to hold otherwise risks "establishing a standard of conduct few can achieve." Like Mr. Frank, we "suspect that many others have lost their temper in comparable circumstances where they believe they have been treated unfairly ..., but have been lucky to escape [Mr. Sabo's] fate." Indeed, Dr. Blumberg and Mr. Briggs respectively characterized it as an "isolated incident" and not having a "definite connection" to the behavior associated with his conviction. And there is no indication that Mr. Sabo has an anger-management problem. Although Dr. Blumberg expressed concern, he did not agree that Mr. Sabo should be barred from practicing law due to this incident. Based on these facts, and consistent with our tradition of placing "great weight" on the Hearing Committee's factual findings, we conclude that the incident, while regrettable, does not negate Mr. Sabo's satisfaction of the third *Roundtree* factor. *Roundtree*, 503 A.2d at 1217.

\*　　\*　　\*　　\*　　\*　　\*

In the twelve years since his conviction, Mr. Sabo has restructured his life and is a productive contributor to society. Mr. Sabo appears committed to continuing mental health treatment and, apart from the incident at Home Depot, has had an exemplary record of conduct. We agree with the Hearing Committee that Mr. Sabo has established by clear and convincing evidence that he has taken steps to "remedy past wrongs and prevent future ones," *Roundtree*, 503 A.2d at 1217, and therefore has satisfied the third *Roundtree* factor.

## D. Petitioner's Present Character

Under the fourth *Roundtree* factor, a petitioner is required to prove that those traits that led to disbarment "no longer exist and, indeed, that he is a changed individual having full appreciation of the wrongfulness of his conduct and a new determination to adhere to the high standards of integrity and legal competence which the Court requires." *In re Turner*, 915 A.2d 351, 356 (D.C.2006) (per curiam). In doing so, the petitioner is expected to "put on live witnesses familiar with the underlying misconduct who can provide credible evidence of . . . petitioner's present good character." *Reynolds*, 867 A.2d at 986.

For the reasons discussed in our assessment of the second *Roundtree* factor, we find that Mr. Sabo has a full appreciation of the wrongfulness of his conduct. In assessing whether Mr. Sabo is a changed individual, we consider his business and community activities since 2000, his participation in mental health treatment, testimony of his four character witnesses, and his own testimony.

Resoundingly, the witnesses spoke highly of Mr. Sabo. Reverend Brown observed that, prior to his conviction, Mr. Sabo was a "person who felt a certain degree of entitlement" but that he has since had a "reordering of values" and members of the congregation have noted a "profound change" in him. Further, he noted that there is "ample opportunity" for frustrating situations at the church but he never saw Mr. Sabo respond in a way that caused him concern. Similarly, J. Russell George, Inspector General of the Internal Revenue Service and a former colleague of Mr. Sabo, believes Mr. Sabo has "taken significant steps to try to overcome [his]

personal failings," and noted a "dramatic difference" in his character. And Alan Perichino, for whom Mr. Sabo worked for a period of time after his release from prison, never saw Mr. Sabo display anger, described his current marriage as "very stable," and considers him a "churchgoing individual."

Although the witnesses appeared to have a general understanding of the incident at Home Depot, we agree with the Board that Mr. Sabo did not provide them with the most detailed explanation. *Accord, In re Fogel*, 679 A.2d 1052, 1056 (D.C.1996) (petitioner failed to establish present good character where witnesses were not familiar with the details of his criminal misconduct that led to disbarment). Mr. Sabo did not inform the witnesses that he was actually arrested (via issuance of a Virginia Uniform Summons), two were unaware that he pled guilty to larceny, one learned of the incident in a "secondary fashion," and another was not aware of the final disposition. Given the unusual nature of this incident—Mr. Sabo was arrested (but via a summons) and pled guilty but was not convicted and the charge was dismissed—we do not find that these omissions materially undermine the witnesses' assessment of Mr. Sabo's present character.[9] Nor did these omissions alter the Hearing Committee's conclusions that the witnesses were "credible" or "highly credible" and that Mr. Sabo demonstrated he has "strong moral character and integrity."

Finally, we are persuaded by Mr. Sabo's testimony that he is a changed man:

> Well, I certainly no longer think I'm on top of my game. It's a very humbling experience. The best example . . . it

---

**9.** Because Rebecca Wright, first a client of Mr. Sabo's remodeling business, then his girlfriend, and later his friend, was unaware of the details of the incident at Home Depot and

was unsure whether or not it would have an impact on her positive assessment of Mr. Sabo, we have not considered her testimony in our evaluation of this *Roundtree* factor.

wasn't a year or so before the arrest working for Congress ... traveling the world. I stood on the Great Wall of China. The feeling for myself and my accomplishments was truly high to say the least.

Two years later I was incarcerated in the Arlington County Jail. The depth of that drop is unbelievable. I say this metaphorically, but to be stripped naked and shown all of our weaknesses in a public setting. ... Reports of my crying during testimony, it was just horrible.

Accordingly, we agree with the Hearing Committee and Bar Counsel that Mr. Sabo adequately established good moral character.

### E. Petitioner's Present Qualifications and Competence to Practice Law

Bar Counsel, the Hearing Committee, and the Board all concluded that Mr. Sabo possesses the competence and qualifications to practice law. We agree. Mr. Sabo's disbarment was unrelated to the practice of law. Since disbarment, he has attended three continuing legal education courses offered by the District of Columbia Bar, two in 2010 and one in 2011, and several courses in government contracts at Northern Virginia Community College. Additionally, Mr. Sabo represented himself *pro se* in the reinstatement proceedings, including briefing and oral argument in this court, as well as in the civil suit brought by Ms. Lawrence in 2002, and he drafted the petitions and pleadings for his criminal appeals.

### F. Condition of Reinstatement

Bar Counsel and the Hearing Committee recommend conditioning Mr. Sabo's reinstatement, pursuant to D.C. Bar R. XI, § 16(f), on his continuance in mental health treatment, at a frequency and manner recommended by his mental health

professional, for at least five years after reinstatement. We requested the Board to opine on the "extent [to which] the condition ... will sufficiently protect the public, and ... why the five[-]year period was chosen and deemed adequate." Now, we are satisfied that the condition is appropriate.

██ As an initial matter, we make clear that we have determined that Mr. Sabo is fit to be reinstated to the District of Columbia Bar without regard to the proposed condition. The rules make clear that conditions on reinstatement may be imposed only "[i]f the attorney is found fit to resume the practice of law." D.C. Bar R. XI, § 16(f). In other words, conditions on reinstatement are not a substitute for proof of fitness but are instead intended to "help even a fit attorney ... meet the challenges of returning to practice." *In re Robinson,* 915 A.2d 358, 361 (D.C.2007) (per curiam) (*Robinson II* ). To that end, we have ordered attorneys to submit to monitoring and to participate in counseling and support groups. *See, e.g., In re Roxborough,* 775 A.2d 1063, 1064–65 (D.C. 2001) (per curiam); *In re McConnell,* 667 A.2d 94 (D.C.1995) (per curiam); *In re Peek,* 565 A.2d 627 (D.C.1989). We believe ordering continued mental health treatment for the next five years will aid Mr. Sabo as he restarts his legal career.

Admittedly, the five-year period is somewhat arbitrary, but we find that it reflects the seriousness of Mr. Sabo's prior conduct while at the same time being manageable. Imposing a requirement to attend treatment or support groups, with monitoring, for a limited period of time for a condition that may necessitate lifelong treatment is not without precedent. *See, e.g., McConnell,* 667 A.2d at 94 (conditioning reinstatement upon participation in Alcoholics Anonymous meetings, monthly reporting to the D.C. Bar's Lawyer Counseling Program, and random

drug testing for five years); *In re Shorter*, 603 A.2d 462, 463 (D.C.1992) (per curiam) (imposing a requirement for continued participation in weekly meetings of Gamblers Anonymous, counseling from the D.C. Bar's Lawyer Counseling Program, and monitoring of income tax payments for five years).

Citing *In re Appler*, 669 A.2d 731 (D.C. 1995), the Board concluded that imposing a monitoring condition would be "impractical and inappropriate" due to the lifelong nature of Mr. Sabo's illness. We disagree. In *Appler*, this court concluded the monitoring was an "undisputed absolute necessity ... to prevent a repetition of the misconduct," which led to recognition that indefinite monitoring would be necessary. *Appler*, 669 A.2d at 740. In contrast, here the psychiatrist engaged by Bar Counsel supported the imposition of a requirement for continued treatment, but only as an "additional" motivator, not as a necessary motivator, and the Hearing Committee concluded that Mr. Sabo is "commit[ted] to remain in treatment for the rest of his life."

Accordingly, we adopt Bar Counsel's recommendation to condition Mr. Sabo's reinstatement on continuing mental health treatment, in a fashion recommended by his mental health provider, for the next five years. Mr. Sabo is ordered to direct his mental health provider to submit a notice of compliance or non-compliance every six months to Bar Counsel and the Board. We remind Mr. Sabo that "[f]ailure to comply with conditions of reinstatement may result in revocation of the reinstatement order." D.C. Bar R. XI, § 16(f).

### III. Conclusion

We commend the Board for the thorough consideration it has given this matter, including its decision to refer the case to a Hearing Committee for fact-finding. Where we part company with the Board is our determination that its recommendation would mean, in essence, that rehabilitation and redemption, particularly from problems caused by mental illness, are not possible. We decline to accept such a Procrustean approach, particularly in the case of a petitioner such as Mr. Sabo, who has taken every step imaginable to turn his life around. On this record, we cannot help but conclude that Mr. Sabo has demonstrated by clear and convincing evidence that he is fit to resume the practice of law, and we grant his petition for reinstatement.

*So ordered.*

Dissenting statement by Senior Judge STEADMAN.

STEADMAN, Senior Judge, dissenting:

At this time, I would deny reinstatement, substantially for the reasons set forth by the Board in its conscientious report and recommendation. Mr. Sabo has the right to maintain his innocence, but it does not seem to me that the Board is unreasonable in asking for a full and complete exposition for this position. Such an exposition would not be to retry the conviction but rather to provide a total picture of Mr. Sabo's present state of mind vis-a-vis the conviction and its surrounding circumstances. Likewise, given the unquestioned concern that any lapse in therapy could have serious consequences and the "red flag" event of 2009, it seems quite reasonable for the Board to require a "longer track record of compliance, without incident." Mr. Sabo was unable to convince a single one of the nine members of the Board that he had shown by "clear and convincing evidence" his entitlement to reinstatement, nor, by the same standard, has he yet convinced me.