*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-BG-154

IN RE ROBERT W. MANCE, III, PETITIONER.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 285379)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-250-13)

(Argued December 7, 2016                    Decided October 26, 2017)

*Wendell C. Robinson* for petitioner.

*Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel, and *Jelani C. Lowery*, Senior Staff Attorney, were on the brief, for respondent.

Before THOMPSON and BECKWITH, *Associate Judges*, and REID, *Senior Judge*.

THOMPSON, *Associate Judge*:   On January 26, 2012, this court imposed a negotiated disciplinary sanction[1] on petitioner Robert W. Mance III, suspending him from the practice of law in this jurisdiction for six months and conditioning his reinstatement upon proof of fitness to practice law and payment of restitution to

---

[1] *See* D.C. Bar R. XI, § 12.1 (d).

certain clients.  *See In re Mance*, 35 A.3d 1125, 1127 (D.C. 2012).  The discipline was based on three matters, involving complainants Leonard Garrett, Wilmer Riley, and Sedley Randolph.  As the Hearing Committee found, Mr. Mance "admitted to multiple violations of the disciplinary rules arising from his neglect of . . . client matters" in those cases.[2]

On June 26, 2013, Mr. Mance petitioned for reinstatement.  In opposing the petition, Bar Counsel (now known as "Disciplinary Counsel," the term by which we hereafter refer to the Office) filed a proffer regarding alleged misconduct involving two additional complainants, Steven Swann and Lawrence Hemphill.  Disciplinary Counsel had previously dismissed their complaints as part of the negotiated-discipline agreement, or as a result of Mr. Mance's suspension, while reserving the right to present evidence about them should Mr. Mance seek reinstatement

---

[2]  Specifically, Mr. Mance acknowledged that his conduct in those matters violated the following District of Columbia Rules of Professional Conduct:  Rule 1.1 (a) (failure to provide competent representation); Rule 1.1 (b) (failure to serve a client with skill and care); Rule 1.3 (a) (failure to provide zealous and diligent representation); Rule 1.5 (b) (failure to provide client with a writing stating the rate or basis of fee); Rule 1.7 (b) (representing client at a time when the attorney's professional judgment may have been affected by his own interest); Rule 1.8 (business transaction with client); and Rule 1.16 (d) (failure to timely surrender client's papers upon termination of the representation).  *See* 35 A.3d at 1126.

Hearing Committee Number Six held a hearing on Mr. Mance's reinstatement petition on May 2, 2014, and issued its report and recommendation on February 22, 2016. Although the Hearing Committee found that Mr. Mance testified credibly, it recommended denial of his petition. There followed this matter, Mr. Mance's petition to this court for reinstatement. For the reasons that follow, we grant the petition, with conditions.

## I.

"When [Disciplinary] Counsel contests a [reinstatement] petition, . . . a hearing is convened after which the Hearing Committee submits a report of its findings and recommendations to this court for a final disposition." *In re Sabo*, 49 A.3d 1219, 1222 (D.C. 2012). "[T]he recommendation of the [Hearing Committee] is only a recommendation," *id.* at 1224 (internal quotation marks omitted), however, and even where — as here — we are presented with a Hearing Committee report that reflects "commend[able]" and "thorough consideration," *id.* at 1234, and a "conscientious . . . recommendation,"[3] "the determination of fitness to resume the practice of law rests entirely with this court." *Id.* at 1224 (internal quotation marks omitted). In exercising our "ultimate authority to decide whether

---

[3] *Id.* at 1234 (Steadman, J., dissenting).

to grant a petition for reinstatement," *id.*, we "place great weight on the recommendations of the . . . Hearing Committee," *id.* (internal quotation marks omitted), and we accept the Hearing Committee's findings of fact "unless they are unsupported by substantial evidence of record." *In re Mba-Jonas*, 118 A.3d 785, 787 (D.C. 2015) (internal quotation marks omitted).

A petitioner seeking reinstatement bears the burden of proof to "demonstrate by clear and convincing evidence that he . . . is fit to resume the practice of law." *In re Sabo*, 49 A.3d at 1223 (internal quotation marks omitted); *see also* D.C. Bar R. XI, § 16 (d)(1).[4]  Proof of fitness requires a demonstration "'(a) [t]hat the attorney has the moral qualifications, competency, and learning in law required for readmission; and (b) [t]hat the resumption of the practice of law by the attorney will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest.'" *In re Daniel*, 135 A.3d 796, 797 n.2 (D.C. 2016) (quoting D.C. Bar R. XI, § 16 (d)(1)(a)-(b)).  The following factors are to be considered in a determination of whether the attorney has made the required showing:

---

[4]  Clear and convincing evidence is "'evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" *In re Cater*, 887 A.2d 1, 24 (D.C. 2005) (quoting *In re Dortch*, 860 A.2d 346, 358 (D.C. 2004)).

> (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985).

## II.

We begin our analysis by briefly describing "the nature and circumstances of the misconduct for which the attorney was disciplined," *id.*, and the additional misconduct the Hearing Committee considered. In the Garrett matter (Bar Docket No. 2009-D247), Mr. Mance, who was representing Mr. Garrett in a civil suit, failed to file a brief on Mr. Garrett's behalf or to ask for an extension of time, which resulted in the dismissal of the case for want of prosecution. *See In re Mance*, 35 A.3d at 1126. After Mr. Garrett filed a complaint with Disciplinary Counsel, Mr. Garrett met with Mr. Mance, at Mr. Mance's request, and entered into a written agreement whereby Mr. Mance agreed to pay him $4,500 (the retainer he had paid) plus an additional $15,000 as settlement of "any issues or differences between them." *Id.* (internal quotation marks omitted). Mr. Mance did not advise Mr. Garrett to obtain the advice of outside counsel and failed to provide

sufficient information for Mr. Garrett to provide informed consent. *Id.* Thereafter, Mr. Mance made two payments to Mr. Garrett that amounted to $900 and then ceased payment (until, as discussed below, after he had petitioned for reinstatement). *Id.*

The Riley matter (Bar Docket No. 2009-D369) involved Mr. Mance's failure, despite a court order, to produce documents (which Mr. Riley had turned over to him) in response to a request for production of documents and an order compelling production. *Id.* The omission led the court to impose sanctions, which included an order precluding Mr. Riley from testifying at trial, presenting exhibits at trial, and presenting evidence as to damages. *Id.* Mr. Mance did not file a motion to vacate or reconsider the court's order, and instead, after failing to respond to opposing counsel's motion to dismiss or in the alternative for summary judgment, represented Mr. Riley on appeal. *Id.* Mr. Mance did not advise Mr. Riley to seek outside counsel even though the issue on appeal involved his own failure to act on Mr. Riley's behalf. *Id.*

In the Randolph matter (Bar Docket No. 2010-D025), after representing Mr. Randolph in his criminal case, Mr. Mance failed to respond to requests by Mr. Randolph for his case materials, forwarding the file only after Disciplinary

Counsel got involved. *Id.* In addition, Mr. Mance's first attempt at forwarding the file failed because he had failed to ascertain the rules of mailing packages to the federal correctional center where Mr. Randolph was incarcerated.

Regarding the *Swann* matter (Bar Docket No. 2011-D219),[5] Disciplinary Counsel proffered that Mr. Mance filed on Mr. Swann's behalf a petition for review of an adverse decision by the Office of Employee Appeals but failed to name and serve the proper respondent, timely file the petition, and properly file an opposition to a motion to dismiss. Mr. Mance also noted an appeal from dismissal of the case, even though he had a conflict of interest in continuing to represent Mr. Swann.

Regarding the *Hemphill* matter (Bar Docket No. 2011-D398), Disciplinary Counsel proffered that Mr. Mance, who had represented Mr. Hemphill in a deposition by the United States Attorney's Office, agreed to write a letter on Mr. Hemphill's behalf explaining to the Assistant United States Attorney why it would be a hardship on Mr. Hemphill to have additional funds seized from a pension

---

[5] The Hearing Committee found that "the unadjudicated acts [in the *Swann* and *Hemphill* matters were] supported by a preponderance of the evidence and, as such, [were] admissible." In his testimony before the Hearing Committee, Mr. Mance acknowledged misconduct in both cases.

owned by his wife. Mr. Mance acknowledges that he failed to communicate with Mr. Hemphill regarding the status of the letter.

As the Hearing Committee found, the foregoing instances of misconduct "involved a consistent pattern of neglect, including the failure to communicate with clients and to comply with multiple court orders, and two instances of conflict of interest." As the Hearing Committee also noted, Mr. Mance has a history of discipline by this court, having received informal admonitions in 1996 and 2000, a thirty-day stayed suspension in 2005, and a public censure in 2009. The 1996 and 2000 informal admonitions were for failing to provide a written retainer agreement as required by Rule 1.15 (b). *See In re Mance*, 980 A.2d 1196, 1208 (D.C. 2009). The 2005 stayed suspension and period of probation were for Mr. Mance's filing of an untimely notice of appeal in his client's criminal case, neglect in failing to pursue a claim that some of the offenses of which the client was convicted merged, failing to communicate with the client about the appeal, and delay in withdrawing from the case after learning that the client sought to terminate his engagement. *In re Mance*, 869 A.2d 339, 340 (D.C. 2005). We accepted, as supported by substantial evidence, the Board on Professional Responsibility (the "Board") finding attributing Mr. Mance's violations to his "overwhelming case load at the time of the events at issue." *Id.* at 342 (internal quotation marks omitted).

This court imposed the 2009 public censure in an opinion in which we held that "for purposes of Rule 1.15 (d), money paid by a client as a flat fee for legal services remains the client's property, and counsel may not treat any portion of the money otherwise until it is earned, unless the client has agreed otherwise." *In re Mance*, 980 A.2d at 1199. We determined to apply that interpretation only prospectively, however, and we adopted the Board's recommendation that Mr. Mance receive a public censure for having commingled funds when he placed into his operating account a portion of a flat fee a client had paid to him, causing a delay in returning the funds when the client terminated his services, "because he did not have the funds readily available." *Id.* at 1199-200. Mr. Mance also received a public censure in Maryland as reciprocal discipline, and, in 1979, received a private reprimand in South Carolina for failing to perfect an appeal.

**III.**

The foregoing informs our consideration of the first *Roundtree* factor. As to the remaining *Roundtree* factors, the Hearing Committee's primary focus was on the third *Roundtree* factor — specifically, on what it found to be Mr. Mance's

failure to take adequate "steps . . . to remedy past wrongs and prevent future ones." We address that finding in section IV below.

In our view, the other *Roundtree* factors weigh in Mr. Mance's favor. Regarding whether Mr. Mance "recognizes the seriousness of [his] misconduct" (*Roundtree* factor 2), the Hearing Committee found that Mr. Mance "recognize[s] that his clients were entitled to better service," and that he testified "credibly" that he is "remorseful and disappointed in himself and ha[s] gone through a period of introspection." The Hearing Committee noted that Mr. Mance's character witnesses corroborated his testimony, recounting that Mr. Mance had "expressed remorse for his ethical lapses and a desire to change the behaviors that caused his misconduct."[6] The record supports the Hearing Committee's findings. For example, Mr. Mance testified that Mr. Garrett "did not get the kind of representation from me that he was entitled to," that he (Mr. Mance) did not "render good service" and provided "deficient representation," and that he "should have . . . advise[d] Mr. Garrett to seek other counsel." Mr. Mance also recognized in his testimony that being "busy doing something else . . . is not a reason for not

---

[6] The Hearing Committee nevertheless concluded that Mr. Mance did not satisfy the second *Roundtree* factor because "he failed to demonstrate that he fully grasps the root causes of his misconduct and has taken concrete steps to address it," but we see that concern as more properly addressed in a consideration of the third *Roundtree* factor.

being more responsive to clients when they're trying to reach you." Mr. Mance further acknowledged that to practice effectively an attorney must "adhere[] to deadlines" and that, before taking on a case, an attorney must consider how much he "can do during a certain period of time" and avoid having "too many . . . client matters on [his] plate." He acknowledged that "going back to 2005," he had "more on [his] plate than [he] could handle."

Regarding the fourth *Roundtree* factor ("the attorney's present character") and the fifth factor ("the attorney's present qualifications and competence to practice law"), the Hearing Committee credited the testimony of his character witness Antoini Jones, Esq., who was "fully aware of [Mr. Mance's] disciplinary record and the basis for his current suspension," that Mr. Mance "has the competence and character to practice law."[7] Disciplinary Counsel likewise acknowledged at oral argument before us that there can be "no doubt" about Mr. Mance's "good intentions," his "learning" in the law, and his legal advocacy skills.

---

[7] The Hearing Committee nevertheless found that Mr. Mance's "failure to . . . take concrete steps necessary to avoid similar misconduct in the future raises doubts about his present character" and concluded that he failed to satisfy the fourth *Roundtree* factor. Again, we believe that assessment is better addressed in our discussion of whether Mr. Mance has satisfied the third *Roundtree* factor.

In considering the fourth *Roundtree* factor, we, too, are satisfied that Mr. Mance "is a changed individual having full appreciation of the wrongfulness of his conduct and a new determination to adhere to the high standards of integrity and legal competence which the [c]ourt requires."[8]  We note that in determining to publicly censure Mr. Mance in 2009, we observed that his "prior misdeeds, while not to be dismissed, do not implicate his moral character or integrity."  *In re Mance*, 980 A.2d at 1208.  We also noted the Board's finding that Mr. Mance did not "act dishonestly or attempt to misappropriate client funds."  *Id.*  Further, the record indicates that Mr. Mance has taken three training courses since the beginning of his (now over-five-year) suspension, including a training session on the Superior Court electronic filing system and a several-hours-long course on the different ethical requirements of the District, Maryland, and Virginia.  The record also shows that, during his suspension, Mr. Mance has made an effort to keep apprised of legal developments through his part-time work in Mr. Jones's law office and the law office of his counsel Wendell Robinson, through discussion of cases with those attorneys, and through research in law libraries.  Per Mr. Jones's "credited" testimony, during this time Mr. Mance has "produced competent legal research."

---

[8]  *In re Sabo*, 49 A.3d at 1232 (quoting *In re Turner*, 915 A.2d 351, 356 (D.C. 2006) (per curiam) (Board Report attached to the court's opinion)).

**IV.**

That brings us to the most critical issue in this case: whether Mr. Mance has shown by clear and convincing evidence that his reinstatement is warranted in light of facts relevant to the third *Roundtree* factor, which requires consideration of "the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones." In considering this factor, the Hearing Committee acknowledged Mr. Mance's testimony that he took a D.C. Bar training course that, in his words, taught him that to practice effectively, he must "work at" "adherence to deadlines" and at "be[ing] more responsive to clients and . . . more available to clients." The Hearing Committee found that Mr. Mance also had "acknowledged the need to control his calendar and to not accept work he is unable to handle." The Hearing Committee found fault, however, with Mr. Mance's having "failed to establish that he has taken the proactive measures necessary to address the deficiencies in his practice, including such fundamental steps as developing a practice management plan." The Hearing Committee mentioned, for example, Mr. Mance's testimony that he had unsuccessfully tried to use case management/accounting software back in 2005, finding it "too complicated." The Hearing Committee also cited Mr. Mance's testimony to the

effect that he is "unsure of the type of office support he will require if reinstated, because he does not know what kind of client base he will have." The Hearing Committee found that Mr. Mance "failed to demonstrate that he fully grasps the root causes of his misconduct and has taken concrete steps to address it by, for example, taking the courses or training necessary to establish his proficiency in case management." This left the Hearing Committee with "little assurance that, if reinstated, [p]etitioner will not repeat the pattern of misconduct that led to his suspension."

The Hearing Committee cited in addition Mr. Mance's payment of restitution to Messrs. Garrett, Hemphill, and Swann "only after he filed his petition for reinstatement years after his representation of these clients ended," and his failure "to pay any restitution to Mr. Riley"[9] (matters that the Hearing Committee considered as evincing Mr. Mance's lack of "true recognition of the seriousness of [his] misconduct" and as a negative with respect to his "steps taken to remedy [the misconduct]"). The Hearing Committee recognized, however, that this court's

---

[9] The Hearing Committee noted that Mr. Mance paid a stipulated judgment amount of $5,000 to Mr. Garrett eighteen months after the judgment (that was in addition to another $900 Mr. Mance had paid Mr. Garrett in 2009), and that he reimbursed Mr. Swann $3,500 for the "at least $3,500" Swann had paid him. Mr. Mance testified that he refunded Mr. Hemphill the full $1,000 that Mr. Hemphill paid for Mr. Mance to represent him in a deposition because he believed that his misconduct "warranted [Mr. Hemphill's] being reimbursed the full fee."

2012 suspension order did not require Mr. Mance to pay restitution as to Mr. Riley (and Mr. Mance contended that all the fees Mr. Riley paid him had been earned for work during 2006-08 and were not implicated by the deficient representation that happened in 2009). Distinguishing restitution from damages owed because of an attorney's malpractice, the Hearing Committee found "an insufficient basis to conclude that [p]etitioner owed restitution to Mr. Riley." The Hearing Committee also acknowledged that Mr. Mance was not subject to a restitution condition with respect to the Swann and Hemphill matters.

While we do not in any way minimize the relevance and seriousness of Mr. Mance's failure to make timely restitution payments, we note his explanation that his suspension caused him "significant damage . . . financially." He testified that after his suspension, his income source was mostly Social Security checks, and that it was difficult to make restitution when he was not working full-time and when he was "close to the line" on other monthly obligations.[10] He acknowledged that he

---

[10] One of Mr. Mance's character witnesses, Elijah Rogers, noted that Mr. Mance indicated that he could no longer afford to play golf with a group of friends with whom he had previously played weekly. We cite this testimony to say that the record contains no suggestion that Mr. Mance was utilizing funds that he could have used to pay restitution to support personal luxury. In any event, Mr. Mance acknowledged in his hearing testimony that paying Mr. Garrett should have been a priority and was "the correct thing for [him] to do."

had bounced a number of checks in 2013, and he attributed his delayed restitution payments to "bad budgeting and bad money management." As the Hearing Committee expressly acknowledged, this court's cases establish that delayed restitution is not a barrier to reinstatement where there is an adequate explanation for the non-payment.[11] The Hearing Committee found that "without more," the delayed restitution payments "might not be a barrier to reinstatement."

In the end, the Hearing Committee recommended against reinstatement because of Mr. Mance's failure to show that he has taken "concrete steps necessary to avoid similar misconduct in the future" — more specifically, his failure to show "that he understands and is prepared to implement the case management techniques necessary to control his caseload and avoid future misconduct" and his "fail[ure] to demonstrate that he fully grasps the root causes of his misconduct and has taken concrete steps to address it by, for example, taking the courses or training

---

[11] *See, e.g.*, *In re Turner*, 915 A.2d at 355 (reinstating the petitioner even though "the record show[ed] that [he] did not have steady income for a period of time, and thus did not have the ability to pay restitution," and that he made three installment payments in 1999 "but discontinued the payments because of financial difficulties"; noting that when the petitioner's "situation changed in 2005, [he] initiated a formal payment plan to pay $75 monthly" and "[a]t the time of the Hearing Committee's decision, . . . had made the scheduled payments for eight months"); *In re Roxborough*, 775 A.2d 1063, 1078 (D.C. 2001) (noting the petitioner's testimony "that he has not earned enough income since he left law practice to be able to pay all of the restitution owed," and stating that "it should not be absolutely required that restitution is complete before reinstatement").

necessary to establish his proficiency in case management." Mr. Mance's failure to demonstrate his proficiency in case management left the Hearing Committee with "a substantial question as to whether he will actually be able to" "install case management software programs and use them in his practice." The Hearing Committee also found that Mr. Mance "failed to explain with any specificity how he intend[s] to manage his case load, communicate with his clients, or calendar cases so that he can respond to court orders and schedules and meet filing deadlines."

We are loathe to premise our decision on reinstatement on whether Mr. Mance has demonstrated proficiency in using case management software programs.[12] In the years before such software programs were available, many an attorney effectively practiced law using an old-fashioned system of keeping up with case deadlines and court dates. We think the record in this case shows that the root problem for Mr. Mance — which we think the record shows he does grasp — was that he fell into the pattern of taking on too many cases, with the result that, in his words, he had "more on [his] plate than [he] could handle." He told the Hearing Committee that the "Number 1" step he needed to take is "keeping [his]

---

[12] Also, unlike Disciplinary Counsel, we do not believe the record raises questions about whether Mr. Mance is "prepared to ethically manage client funds."

case load under control." He testified, "I just have to be more careful[,] from the day a client comes in, to discussing the case[,] to determin[ing]whether it's something that I feel I can handle effectively." He explained repeatedly that "when new cases come in, I need to find out more about what it's going to require [from] me to handle it, to find out whether it's something -- based on what I already have in-house[,] . . . that I can handle effectively," rather than take on all cases that come in the door to indulge what he agreed was his "problem saying no to people." He explained that previously, it was not until he "got in the middle of [matters]" that he realized he "couldn't do them [e]ffectively." These explanations ring true in light of the Board's previous finding that Mr. Mance's neglect of client matters resulted from his "overwhelming case load." *In re Mance*, 869 A.2d at 342 (internal quotation marks omitted). Mr. Mance also recognized that, to remedy the things in which he was deficient, he will need to "set[] aside time at some point in the day, whether it's mid-day, whether it's at the end of the day[,] to communicate with clients who've been trying to reach [him]" and to "return phone calls on a daily basis." His statements that "there needs to be certain times of day that [he] do[es] certain things" and that he would need to "not get[] [him]self in a situation[] where [he has] more cases tha[n he] can handle appropriately" sum up his plan for assuring that his misconduct will not repeat itself if he is reinstated. Of course,

only if he resumes practice will we be able to tell whether Mr. Mance is able to responsibly reduce his previous caseload.

We think it understandable that, given the financial constraints that have resulted from his suspension, and without knowing what his client base will be upon reinstatement, Mr. Mance could only (in Disciplinary Counsel's words) "vacillate[] on whether he would hire someone" and could say only that he might have "someone . . . come in a couple of days a week to help [him] with file management and organizational-type things."  For the same reasons, while we acknowledge Disciplinary Counsel's concern that Mr. Mance has not worked out a business plan regarding his income if he resumes law practice, we believe he will have time to do that once he resumes practice and understands what client work will be his referral base[13] and before (under the reinstatement conditions we describe below) he is permitted to resume practice as a solo practitioner.

We note Mr. Mance's testimony that being deprived of the ability to make a living because of his suspension, and the introspection that this caused him to undertake, have given him a "motivation [that] is different" from any he had before

---

[13]  Mr. Mance testified that he learned in a course that "80 percent of your new clients come from 20 percent of your old clients [through] referrals."

to avoid putting himself in a position where he could not balance his case load. We are satisfied that, with his credited testimony about his "best of intentions" to take on only the client matters he has determined he can handle and to set aside time for client communications, Mr. Mance has demonstrated by clear and convincing evidence that he is fit to be reinstated to the practice of law. At the same time, we recognize that, as one of his character witnesses observed, practice as a solo practitioner almost inevitably "involves volume, because of the nature of the clients you represent." The record shows that, until his suspension, Mr. Mance had been in solo practice since 1997, and, at the hearing, he acknowledged a desire to return to solo practice. This underlies our consideration of what conditions we might impose on Mr. Mance's reinstatement to ensure that he receives assistance in his efforts not to repeat the conduct that led to his suspension: taking on more matters than he can handle.

## V.

The Hearing Committee, in recommending against reinstatement, and Disciplinary Counsel, in opposing reinstatement with conditions, emphasize this court's statement that "conditions on reinstatement are not a substitute for proof of fitness." *In re Sabo*, 49 A.3d at 1233. They also emphasize this court's statement

in *Sabo* that D.C. Bar Rule XI, § 16 (f) makes clear that the court may impose "conditions on reinstatement as it deems appropriate" only if the attorney is "fit to be reinstated to the District of Columbia Bar without regard to the proposed condition." *Id.*

We agree that the standard as explicated in *Sabo* is controlling. At the same time, our cases have recognized that conditions on reinstatement may be warranted in the interest of facilitating a reinstatement petitioner's "continued fitness in the initial period after he . . . returns to the practice of law," so as "to assure that petitioner will not commit future disciplinary violations of the kind for which he was [disciplined]," *In re McConnell*, 667 A.2d 94, 97 (D.C. 1995) (internal quotation marks omitted), and to "reduce the likelihood that []he will commit the same or similar violations in the future." *In re Roundtree*, 503 A.2d at 1218; *see also In re Turner,* 915 A.2d at 357.

It is helpful to review the facts of *Sabo*. Mr. Sabo was disbarred by consent in 2003 after he was convicted of attempted malicious wounding, a felony and "an act of moral turpitude." 49 A.3d at 1220, 1224. He "contend[ed] that his struggle with depression and other mental health challenges took him 'down a path, down a spiraling tube' that brought about the events that led to his conviction." *Id.* at

1221. After his release from prison in 2003 and intermittently thereafter (including at the time of this court's consideration of his petition for reinstatement), he had been receiving mental health treatment, including medication management and psychotherapy. *Id.* at 1221, 1230. In 2009, during a time when he "was not in psychotherapy," *id.* at 1230, he was "arrested on a charge of larceny by false pretense" after an altercation with a Home Depot store clerk, "but ultimately placed on probation in a program" that he successfully completed, leading to dismissal of the charge. *Id.* at 1222. The Board recommended that Mr. Sabo's petition for reinstatement be denied, in part because it viewed the Home Depot incident "as an indicator of [his] difficulties in dealing with stress," and concluded that "his history of psychotherapy was 'too intermittent and short-lived' to support reinstatement." *Id.* at 1223.

In considering the *Roundtree* factors, we noted that Mr. Sabo "acknowledged the seriousness of his mental illness and . . . its effect on his decision-making capabilities and actions," confirmed that his depression would be a "'lifelong battle,'" expressed a "commitment to remaining in treatment indefinitely," and candidly admitted that for him to make sound decisions would require "'continued medication[,] frankly.'" *Id.* at 1227, 1229-30. Even while noting the Board's concern that Mr. Sabo had been in psychotherapy only

intermittently and observing that the Home Depot incident "show[ed] an error in judgment," we concluded that Mr. Sabo had "taken steps to 'remedy past wrongs and prevent future ones'" and had satisfied the *Roundtree* factors, and that a denial of reinstatement was not warranted. *Id.* at 1229-31. We conditioned Mr. Sabo's reinstatement on "continuing mental health treatment, in a fashion recommended by his mental health provider, for [a period of] five years." *Id.* at 1234. We have similarly ordered conditions for reinstatement in other cases, such as ordering attorneys to submit to supervision by a practice monitor and to participate in counseling and support groups. *See In re Roxborough*, 775 A.2d at 1064-65; *In re McConnell*, 667 A.2d at 94; *In re Brown*, 845 A.2d 519, 522 (D.C. 2004).

In this case, we conclude, much as we did with respect to Mr. Sabo, that Mr. Mance is fit to be reinstated to the practice of law but that the conditions we have determined to impose "will aid [him] as he restarts his legal career." *Sabo*, 49 A.3d at 1233. We accept Mr. Mance's representation that he will take steps to control his caseload, but we think the financial pressures of maintaining a solo practice are great enough that conditions on reinstatement are appropriate to reduce the possibility that he will commit future disciplinary violations of the kind for which he was suspended. No doubt it will also be helpful for Mr. Mance to have the support of case management resources (both software and personnel resources)

that group practice or employment by a law firm may bring with it, since the record establishes that he is not adept at using case management software himself and that, in the near-term, he may be unable as a solo practitioner to afford to hire the support staff he would need to utilize such a system effectively.

To be clear, we do not conclude that these things are necessary for Mr. Mance to be fit to practice; indeed, if he takes on a very small caseload (which perhaps he will do since he will have his Social Security income as a supplement to income from law practice), it should be possible for him to adhere to deadlines and be available to clients using an old-fashioned tickler system even without sophisticated case management software. But we are persuaded that these things would aid him as he resumes the practice of law.

We are satisfied that the conditions we have determined to impose will act as the "'additional' motivator," *id.* at 1234, Mr. Mance needs to avoid any further instances of the type of misconduct that landed him in the disciplinary system and that led to the lengthy suspension he has now served. In determining to reinstate Mr. Mance subject to these conditions, we have also taken into consideration that, as we have observed before, he has a "'lengthy and well-reputed history of providing an important service' to the community by serving as one of the few

members of the bar engaged in the practice of street crime defense." *In re Mance*, 980 A.2d at 1208 (quoting *In re Mance*, 869 A.2d at 342 n.10).

We therefore will reinstate Mr. Mance subject to the conditions (1) that he not engage in solo practice (a restriction that, during oral argument, he indicated a willingness to accept) for a period of three years;[14] (2) that, within six months before resuming the solo practice of law, he attend law practice management training  focused on computer-based case management and law firm financial management;[15] and (3) that, at least sixty days before resuming the solo practice of law, he inform the Executive Attorney of the Board on Professional Responsibility of his intent to do so, in order to facilitate appointment of a practice monitor, who will monitor Mr. Mance's solo practice for one year after he resumes solo practice and who shall report to the Executive Attorney every three months during that period.[16]

---

[14] *Cf. In re Reinstatement of McCormick*, 767 N.W.2d 1, 2 (Minn. 2009) (ordering, as a condition of petitioner's reinstatement to the active practice of law, that for two years "petitioner is prohibited from engaging in the solo practice of law").

[15] *Cf. In re Turner*, 915 A.2d at 357.  The training session(s) should be one(s) offered by the D.C. Bar or the D.C. Bar Practice Management Advisory Service.

[16] *Cf. In re Roxborough*, 775 A.2d at 1064-65.

*So ordered.*