*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-BG-0656

IN RE PAMELA BRUCE STUART.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 220236)

On Report and Recommendation
of the Board on Professional Responsibility

(19-BD-007; DDN 2019-D016)

(Argued October 5, 2022                    Decided March 2, 2023)

*Pamela Bruce Stuart*, pro se.

*Ebtehaj Kalantar*, Assistant Disciplinary Counsel, with whom *Julia L. Porter*, Deputy Disciplinary Counsel, *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, and *Sean P. O'Brien*, Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before BECKWITH and MCLEESE, *Associate Judges*, and THOMPSON, *Senior Judge*.

PER CURIAM: Pamela Bruce Stuart was suspended from the Bar of this court for one year, with a requirement that she demonstrate fitness to practice law before being reinstated. *In re Stuart*, 172 A.3d 393, 394 (D.C. 2017) (per curiam). Ms. Stuart has filed a petition for reinstatement. After holding an evidentiary hearing, a

Hearing Committee of the Board on Professional Responsibility recommended that the court deny the petition. We agree with the Hearing Committee's recommendation and deny the petition.

## I. Procedural and Factual Background

### A. Proceedings in Florida

Ms. Stuart was made a trustee of her father's trust. A dispute arose about her performance of that responsibility. Ms. Stuart's sisters, who are beneficiaries of the trust along with Ms. Stuart, filed a civil lawsuit against Ms. Stuart in Florida. The trial court in that case found that Ms. Stuart had breached her fiduciary duties by loaning herself a substantial amount of money from the trust and by failing to provide requisite annual accountings. More specifically, the trial court found, among other things, that Ms. Stuart: (1) failed to appoint an independent co-trustee as required; (2) instead appointed her brother-in-law, Edward Ryan, as co-trustee even though she knew he was ineligible to be a trustee; (3) effectively operated thereafter as a sole trustee; (4) abused her authority as trustee to the detriment of her sisters; (5) loaned herself over $1.7 million from the trust, without providing collateral or paying interest as required by the terms of the trust; (6) initially failed

to inform her sisters of the loans; (7) created a backdated loan agreement between herself and the trust with respect to the loans; (8) once her sisters and Mr. Ryan discovered the extent of the loans and expressed concerns, pointed out that Mr. Ryan was not eligible to be a trustee and caused him to be removed as co-trustee; (9) threatened to sue Mr. Ryan; (10) claimed that her obligation to repay the loans she took out should be reduced by trust expenses she had paid, trustee fees, and legal fees for her services as trustee at a rate of $675 per hour; (11) largely failed to demonstrate that the loan amount should properly be reduced to reflect trustee fees or expenses; (12) promised to repay the loans but repeatedly failed to carry through on those promises, despite having received income that she could have used to at least partially repay the loans; (13) took steps to shelter income and assets from creditors, including falsely claiming to be a legal resident of Florida; and (14) forfeited any right to compensation as a trustee due to her "multiple and flagrant abuses" of her authority as trustee. The trial court therefore denied Ms. Stuart's request for compensation and expenses relating to her service as trustee and awarded Ms. Stuart's interests in certain Florida real properties to her co-beneficiaries. The trial court also entered a deficiency judgment of over $1.7 million against Ms. Stuart. Ms. Stuart challenged the trial court's judgment in both state and federal court, but the judgment was ultimately affirmed.

Ms. Stuart, who is also a member of the Florida Bar, was charged with violating the Florida Bar rules. In that disciplinary proceeding, Ms. Stuart pleaded guilty to "engag[ing] in a pattern of misconduct" in violation of Fla. R. Prof. Conduct 3-4.3 (acts that are "unlawful or contrary to honesty and justice"), 4-8.4(a) (violating Rules of Professional Conduct), and 4-8.4(b) (acts that "reflect[] adversely on the attorney's honesty, trustworthiness, or fitness as a lawyer in other respects"). Ms. Stuart acknowledged the trial court's finding that she had breached her fiduciary duties. The Supreme Court of Florida suspended Ms. Stuart from the practice of law in Florida for one year.

### B. Petition for Reinstatement in the District of Columbia

As previously noted, this court imposed reciprocal discipline, and Ms. Stuart has now filed a petition for reinstatement. Disciplinary Counsel opposes reinstatement. Ms. Stuart therefore was required to show by clear and convincing evidence that she "has the moral qualifications, competency, and learning in law required for readmission," and that her "resumption of the practice of law . . . will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." D.C. Bar. R. XI, § 16(d)(1). When evaluating a reinstatement petition, we consider the following factors:

(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985).

Ms. Stuart's petition for reinstatement characterized her suspension as the result of a "family dispute." Ms. Stuart claimed that she borrowed from the trust as a result of financial problems caused by a real-estate transaction in which she was defrauded. She claimed that she had informed her family of her intent to borrow from the trust to address the situation. She stated that her failure to prepare annual accountings as required was "reasonable," based on her many other responsibilities and her family's access to information about the trust accounts. She claimed to have repaid over $700,000 of the money she borrowed from her father's trust. She disputed the findings and conclusions of the trial court in the Florida case.

In its answer to the petition, Disciplinary Counsel notified Ms. Stuart that Disciplinary Counsel intended to rely on the "record of the reciprocal discipline

matter in this jurisdiction and the underlying civil and disciplinary matters." Ms. Stuart filed a pre-hearing motion objecting to, among other things, the consideration of evidence and exhibits relating to the Florida civil proceedings. The Hearing Committee denied that motion in relevant part.

### C. Evidentiary Hearing

At the evidentiary hearing, Ms. Stuart's testimony included the following. Ms. Stuart described her personal and professional background, including her service with the Federal Trade Commission and the United States Attorney's Office for the District of Columbia, as well as her time in private practice both at firms and as a solo practitioner. After Ms. Stuart's father died in 1998, Ms. Stuart was appointed as trustee of her father's trust. In 2001, Ms. Stuart purchased a commercial building. Ms. Stuart ended up bringing a lawsuit against the prior owner of that building, and the resulting litigation contributed to Ms. Stuart's financial distress. Ms. Stuart borrowed from the trust during this time, using the proceeds for personal expenses.

Ms. Stuart acknowledged that she appointed Mr. Ryan as trustee even though she was aware that he was not qualified to serve under the terms of the trust. She

expected him to do whatever she asked him to do. She acknowledged that she tried to have Mr. Ryan removed as co-trustee after he raised obstacles to Ms. Stuart's borrowing. In 2009, Ms. Stuart created a backdated loan document between herself as trustee and herself personally. The loan agreement was not approved by her co-trustee, did not specify a loan amount, and authorized additional loans.

Ms. Stuart testified that she had informed Mr. Ryan and her sister Catherine Ryan of her borrowing. Ms. Stuart also explained that after Mr. Ryan was appointed as co-trustee in 2000, the Ryans received monthly brokerage statements for the trust account showing Ms. Stuart's withdrawals. Ms. Stuart believed that members of her family were "well-informed" of her borrowing from the trust. Ms. Stuart agreed, however, that the brokerage statements alone were insufficient to provide an accounting, because they only showed the amount of funds that were withdrawn and not how they were being spent.

Ms. Stuart acknowledged that she "overborrowed" from the trust and failed to file annual accountings. She "recognize[d]" that it was "serious error amounting to misconduct to fail to complete the annual accountings of [her] father's trust in a timely manner." She explained that she was overwhelmed by her many

responsibilities, including caring for her mother, managing the trust, and representing her clients.

Ms. Stuart claimed that some of the withdrawals were for trustee fees and expenses, and the rest of the withdrawals were loans against her anticipated fees and inheritance. Ms. Stuart claimed that she was owed over $1.4 million from the trust to compensate her for trustee fees and expenses. Ms. Stuart acknowledged that she did not create contemporaneous records of the hours she spent working as trustee. Ms. Stuart maintained, however, that she had contemporaneous records because she kept receipts that she used to estimate her hours after the fact.

Although Ms. Stuart received several large payments after she began borrowing from the trust, she did not use those funds to repay the trust. Ms. Stuart did at one point transfer $200,000 to her mother's account, which Ms. Stuart regarded as repayment to the trust. Ms. Stuart described the Florida default judgment against her as "something of a fiction," and she testified that she believed that "did the best [she] could under very difficult circumstances." Ms. Stuart acknowledged that after she was disciplined by the Florida Bar, she did not repay any funds to the trust or pay any restitution. Ms. Stuart claimed that she was unable to pay such

restitution, but she acknowledged using funds to pay personal expenses such as membership in a country club and a social club.

Ms. Stuart called eight character witnesses and submitted letters from two other character witnesses. Those witnesses testified very favorably about Ms. Stuart's ability and character. They also testified to their apparently limited knowledge of the circumstances of Ms. Stuart's underlying misconduct. For example, one witness described that misconduct as excessive borrowing and failure to provide accountings, but the witness said that she did not have all of the details, that Ms. Stuart had never said how much she borrowed, and that her understanding was that Ms. Stuart's sisters had agreed to the loans. Another described the situation as a "family tiff" involving a failure to file accountings. That witness did not know how much Ms. Stuart had borrowed from the trust and believed that Ms. Stuart's family had information about the borrowing. Other witnesses also described the underlying misconduct as a family issue and lacked details about the misconduct.

Disciplinary Counsel introduced the following evidence. In a series of withdrawals between 1998 and 2013, Ms. Stuart took approximately $1.8 million from her father's trust. Ms. Stuart's sister Catherine Ryan was aware "early on" that Ms. Stuart was taking some money out of the trust, but Ms. Ryan understood that

the problem would not be a long-term one. She and her husband tried to help Ms. Stuart, so that Ms. Stuart would stop taking money from the trust. Ms. Stuart repeatedly promised to pay the money back.

Mr. Ryan also had been aware that Ms. Stuart was taking some money from the trust. Sometime around 2003, Mr. Ryan realized that Ms. Stuart had taken a substantial amount of money (over $800,000) from the trust. Ms. Stuart did that without obtaining Mr. Ryan's approval. Mr. Ryan asked Ms. Stuart about the withdrawals, and she said that she would return that money to the trust once she received proceeds from a case that she had been handling. At the time she withdrew the loans, Ms. Stuart did not provide collateral or identify an interest rate at which she would repay her debt.

Ms. Stuart continued to remove money from the trust in the ensuing years, but she agree to repay the money once she obtained proceeds from the sale of the commercial building she had purchased. Ms. Stuart did not do that, however, instead putting the bulk of those proceeds (approximately $1.5 million) into accounts that Ms. Stuart controlled and not paying any of the proceeds to the trust account. In 2010, Mr. Ryan emailed Ms. Stuart demanding information, and Ms. Stuart did not

respond. Around that time, Ms. Stuart demanded that Mr. Ryan resign as co-trustee and threatened to sue him.

In 2012, Ms. Stuart presented the Ryans with a written Plan of Trust Administration to wrap up the estate. By that point, Ms. Stuart had taken approximately $2 million from the trust. Ms. Stuart also presented the Ryans with a loan agreement between herself as trustee and herself personally. Mr. Ryan had not previously seen that agreement, had not been aware of the agreement's existence, and had not approved the agreement. The Plan also claimed that Ms. Stuart was entitled to fees and expenses but did not provide an exact amount. Ms. Stuart later claimed that she was entitled to approximately $1.4 million in fees and $300,000 in expenses.

### D.  Hearing Committee Recommendation

The Hearing Committee made extensive factual findings. The Committee found the Ryans' testimony to be credible, clear, and corroborated by contemporaneous documents. In contrast, the Committee found Ms. Stuart's testimony to be evasive, vague, and false in a number of respects.

Applying the *Roundtree* factors, the Committee first concluded that the nature and circumstances of Ms. Stuart's misconduct were serious and disfavored reinstatement. Ms. Stuart took well over one million dollars from the trust without the full consent or knowledge of her co-trustee or co-beneficiaries, used those funds for her personal expenses, failed to provide required trust accountings, and made virtually no effort to repay the funds she took. The Committee was not persuaded by Ms. Stuart's suggestions that she should have been disciplined less severely because her misconduct arose (1) from a "family matter" rather than a client matter and (2) at least in part because she was overwhelmed by business and personal concerns.

Second, the Committee concluded that Ms. Stuart's failure to present clear and convincing evidence that she recognized the seriousness of her misconduct strongly counseled against reinstatement. Ms. Stuart repeatedly attempted to justify her conduct, minimized the importance of providing accountings, and focused much of her testimony on expressing the view that the Florida courts had treated her unfairly and on criticizing her family members.

Third, the Committee concluded that Ms. Stuart's conduct during her suspension weighed against granting her reinstatement petition. Although Ms.

Stuart took continuing legal education classes during her suspension and successfully performed legal work in Virginia once she was reinstated to the Virginia Bar, the Committee found that Ms. Stuart had taken no steps to reimburse the trust or her sisters. The Committee further declined to credit Ms. Stuart's claim that she was entitled to the money she took from the trust, as payment for trustee fees and expenses.

Fourth, the Committee determined that Ms. Stuart's present character does not support reinstatement. Ms. Stuart's witnesses spoke highly of her character, but they were unfamiliar with the specifics of Ms. Stuart's misconduct and even minimized that misconduct. Moreover, the Committee concluded that Ms. Stuart's testimony and conduct during the disciplinary proceedings revealed an "inability to meet her personal and professional obligations and deadlines" and that Ms. Stuart had failed to show that she was "successfully managing the traits that led to her discipline."

Finally, the Committee acknowledged Ms. Stuart's participation in continuing legal education courses during her suspension and her work in Virginia after her reinstatement there. Nevertheless, the Committee concluded that Ms. Stuart had failed to demonstrate that her present competence and qualifications favored reinstatement. The Committee cited Ms. Stuart's failure to abide by previously

agreed-upon procedures and deadlines, as well as Ms. Stuart's reliance on "inapposite precedent" and voluminous, duplicative, and largely irrelevant evidence to support her petition for reinstatement.

## II. Analysis

"Although we place great weight on the recommendation[] of the . . . Hearing Committee, this court has the ultimate authority to decide whether to grant a petition for reinstatement." *In re Sabo*, 49 A.3d 1219, 1224 (D.C. 2012) (citation and internal quotation marks omitted). We defer to the Hearing Committee's findings of fact, including credibility determinations, unless those findings are not supported by substantial evidence. *In re Cleaver-Bascombe*, 220 A.3d 266, 267, 270 (D.C. 2019) (per curiam).

We generally agree with the Hearing Committee's analysis of the *Roundtree* factors, and we accept the Committee's recommendation that Ms. Stuart's petition for reinstatement should be denied. We do note, however, that although we share the Committee's concerns about Ms. Stuart's conduct during the course of the reinstatement proceeding, we need not and do not rely on that consideration in denying Ms. Stuart's petition. Similarly, we need not and do not rely on evidence

elicited during the proceedings about Ms. Stuart's failure to file timely tax returns, both as a trustee and personally. In our view, the remaining circumstances more than suffice to warrant denial of reinstatement. We are not persuaded by Ms. Stuart's arguments to the contrary.

First, Ms. Stuart appears to argue that the Hearing Committee and this court are required to limit the inquiry into the nature and circumstances of the misconduct for which Ms. Stuart was disciplined to the precise facts reflected in the conditional guilty plea in Florida. That argument contradicts Ms. Stuart's own petition for reinstatement, which made numerous factual assertions about the circumstances of her misconduct that were not reflected in the Florida guilty plea but that Ms. Stuart contended mitigated the severity of her misconduct. Ms. Stuart thus is not in a position to complain that Disciplinary Counsel responded by arguing to the contrary that a full picture of the nature and circumstances of Ms. Stuart's misconduct weighed against reinstatement. *Cf., e.g.*, *Harrison v. United States*, 526 A.2d 1377, 1379 (D.C. 1987) (party cannot complain of admission of evidence "relating to a subject that [the party] opened up").

In any event, we see no basis for a rule that would strictly limit the inquiry into the nature and circumstances of the misconduct for which an attorney was

disciplined to the precise facts found when the discipline was imposed. An attorney seeking reinstatement might well reasonably wish to provide additional information about those circumstances in support of a petition for reinstatement, and Disciplinary Counsel might well seek to do the same in opposition to such a petition. More difficult issues might arise if Disciplinary Counsel sought to establish that an attorney seeking reinstatement had committed different, uncharged disciplinary violations at the time of the original discipline. In our view, however, Disciplinary Counsel did not seek to prove different and additional disciplinary violations in this case. Rather, Disciplinary Counsel permissibly attempted to show that a full picture of the disciplinary violations found in this case showed that the misconduct for which Ms. Stuart was disciplined was more serious than Ms. Stuart claimed.

Ms. Stuart argues that permitting such a broad inquiry is inconsistent with statements in our decisions to the effect that a reinstatement proceeding is not intended to "revisit" the original discipline. *See, e.g.*, *In re Stanton*, 757 A.2d 87, 90 (D.C. 2000) (per curiam) (internal quotation marks omitted). In our view, Ms. Stuart takes those statements out of context. We have said that an attorney seeking reinstatement is not permitted to challenge the validity of the original discipline. *Id.* We have not suggested, however, that the reinstatement inquiry must be limited to the precise facts found in the original discipline. Ms. Stuart also argues that

permitting a broader inquiry contradicts cases requiring that reciprocal discipline be based on "facts that were accepted by the highest court of the foreign jurisdiction." *In re Naegele*, 225 A.3d 984, 994 (D.C. 2020) (per curiam). That principle applies to the original imposition of reciprocal discipline, because in such proceedings this court generally relies on the determinations made in the foreign jurisdiction and generally attempts "to impose the discipline that comes as close as possible to the discipline imposed by the originating jurisdiction." *Id.* at 997. We have never suggested that the principle applies in reinstatement proceedings, which are focused on whether an attorney should be restored to the practice of law in the District of Columbia under the circumstances at the time of the petition for reinstatement.

Second, Ms. Stuart argues that the Hearing Committee could not properly consider the factual findings made in the Florida civil case. We disagree. We see no reason why the Hearing Committee and this court, when considering a reinstatement petition, cannot at least consider factual findings made by a preponderance of the evidence in a separate judicial proceeding. We need go no further in this case, moreover. Although the Hearing Committee cited the Florida trial-court ruling, the Hearing Committee did not give preclusive effect to that ruling, and the Hearing Committee's key factual findings are supported by evidence admitted at the evidentiary hearing in this case. Similarly, we rest our decision to

deny the reinstatement petition on the evidence introduced in this proceeding, not on the findings of the Florida trial court. In light of this conclusion, we need not and do not express any view on the potential applicability of issue preclusion in reinstatement proceedings. *See generally In re Klayman*, 282 A.3d 584, 593 (D.C. 2022) (per curiam) (declining to resolve unclear question about application of preclusion in disciplinary proceedings). We do note, however, that the cases cited by Ms. Stuart on this issue do not clearly support Ms. Stuart's argument. Those cases held that findings in a prior proceeding not involving attorney discipline and involving a less stringent burden of proof cannot properly be given preclusive effect against attorneys in initial discipline proceedings, because in initial discipline proceedings Disciplinary Counsel bears the burden of proof by clear and convincing evidence. *In re Ditton*, 954 A.2d 986, 990 (D.C. 2008); *In re Maxwell*, 798 A.2d 525, 530 (D.C. 2002). Those cases do not govern the potential applicability of preclusion in reinstatement cases, where the attorney seeking reinstatement bears the burden of proof by clear and convincing evidence.

Third, Ms. Stuart argues that this court's decision suspending Ms. Stuart explicitly rejected the theory that Ms. Stuart's misconduct could be understood more broadly than was reflected in the Florida guilty plea. To the contrary, this court's decision simply observed that Ms. Stuart had "stipulated to the factual basis

underlying her Florida discipline." *In re Stuart*, 172 A.3d at 394. We expressed no view about how the nature and circumstances of Ms. Stuart's misconduct should be viewed if Ms. Stuart sought reinstatement. *Id.*

Fourth, Ms. Stuart argues that she lacked notice of Disciplinary Counsel's intent to present evidence of "unadjudicated misconduct" before the Hearing Committee. As we have explained, however, we view the evidence as directed at establishing the nature and circumstances of the conduct for which Ms. Stuart was disciplined, not at proving unadjudicated misconduct. Moreover, Disciplinary Counsel's response to Ms. Stuart's petition for reinstatement gave Ms. Stuart notice of Disciplinary Counsel's "inten[t] to rely on the record of the reciprocal discipline matter in this jurisdiction and the underlying civil and disciplinary matters." To the extent that Ms. Stuart complains about a lack of specific notice that evidence would be presented about her failure to file tax returns, we need not address that issue because we place no reliance on the evidence relating to that issue.

Finally, Ms. Stuart raises numerous other challenges in conclusory fashion, including challenging almost all of the Hearing Committee's factual findings. We decline to address these challenges. *See generally, e.g.*, *Miller v. United States*, 209 A.3d 75, 80 (D.C. 2019) (declining to address issue not adequately briefed on

appeal). We do note, however, that we have determined that the critical factual findings of the Hearing Committee are amply supported by the evidence before the Hearing Committee.

In sum, we conclude that Ms. Stuart has failed to carry her burden to establish that reinstatement is warranted. We therefore deny the petition for reinstatement.

*So ordered.*